The executors and trustees under the will of Ashbrook D. Snelbaker, late of Salem County, New Jersey, seek instructions as to their duties as such. The defendants are the beneficiaries named in the will, all of whom join in complainants' request. William B. Snelbaker, I. Dayton Snelbaker and A. Naomi Snelbaker, the brothers and a sister of decedent, attack the validity of two trusts attempted to be set up in the will, (a) Lawnside Cemetery trust and (b) Snelbaker Home trust.
The will as to these two trusts provides, briefly, as follows:
"All the rest, residue and remainder of my estate, real, personal or mixed, whatsoever and wheresover situate * * * I give, devise and bequeath unto my executors and trustees hereinafter named, and their successors in office, in trust, nevertheless, for the following purposes."
He then sets up six annuities of $3,000 a year and in paragraph 6C of the will he provides as follows:
"(C) I have founded and developed Lawnside Cemetery in the Borough of Woodstown, as a lasting memorial to myself, and have provided for a Perpetual Care Fund from the proceeds of the sale of lots by Lawnside Cemetery Association.
"If said Perpetual Care Fund is not of sufficient amount to care for and maintain the cemetery as hereinafter set forth, I order and direct my Executors and Trustees to set aside a sufficient amount of my principal, and invest the same as hereinafter set forth, and pay from the income thereof a sum not to exceed Twenty Five Hundred ($2,500.) Dollars per year, which sum or sums added to the Perpetual Care Fund as above set forth will be sufficient for the purpose of beautifying said Cemetery by planting ornamental shrubbery and trees, and maintaining the fences, roads and other improvements, and keep the same in good condition, and keep the graves, markers and monuments in a good state of preservation.
"These developments and beatifications shall extend to the full acreage provided by me, and include unplotted as well as plotted land.
"When the said Cemetery shall become self supporting, the principal sum herein specified to be set aside, shall become a part of my residuary estate." *Page 64 
With reference to the Snelbaker Home, the provisions of paragraph 6D of the will are as follows:
"(D) I have erected a dwelling house on Main Street in the Borough of Woodstown of a suitable size and convenient to accommodate twenty-five or more guests, and I hereby order and direct that said dwelling house be used for the purpose of establishing and maintaining a suitable HOME for the care and support of worthy white women, of unquestionable character and moral reputation, whose age is not less than fifty years, and who were born in the County of Salem, New Jersey, the name of which HOME shall be `THE ASHBROOK D. SNELBAKER HOME,' and if it be deemed advisable, that my Executors and Trustees incorporate the same under the statute of the State of New Jersey relating to eleemosynary institutions.
"I order and direct that any and all of the beneficiaries hereinabove named shall have the privilege of being guests in said Home, for and during the term of their natural lives.
"The Home shall not be a charitable institution in the ordinary sense of the word, but shall be as its name indicates a Home where the admitted guests shall have the same courtesy and attention as if they were guests in my own home, and under no circumstances to be treated as objects of charity.
"No applicant who requires medical or hospital attention at the time of the application as a guest of the Home shall be favorably considered, but should the guest, after having entered said Home, require medical or hospital attention, the same shall be provided by the Trustees thereof.
"In case there shall be more guests than can be accommodated in my said Home, and there shall be sufficient funds in hand, I order and direct the Trustees thereof to enlarge said Home to accommodate additional guests.
"The Board of Managers of said Home shall be chosen by my Executors and Trustees herein, and shall consist of a member from each of the following recognized religious denominations in the County of Salem — Methodist, Baptist, Presbyterian, Episcopalian and Lutheran. My Executors and Trustees shall also be members of the Board of Managers."
The defendants Snelbaker say that both of these trusts are invalid, the cemetery trust because it creates a private trust and violates the rule against perpetuities, and that what testator really attempted was to "provide for the carrying on of his business as a memorial to himself."
As to the Snelbaker Home trust, the invalidity is declared to be that testator has failed to express in his will "objects which would constitute a charitable trust" and has violated the perpetuity rule, and that the purpose of the trust and *Page 65 
the method of conducting it are vague and indefinite to the extent of invalidity, and that there is nothing in the will by which the court may direct which portion of the estate should be used for the purpose of the trust, i.e., whether income or principal.
At the outset, in determining whether or not the provisions of the will creating these trusts are valid, certain fixed principles should be kept in mind; that the courts start out with an attitude in favor of the attempt to create a charitable trust, rather than with a hostile attitude toward that attempt, and that were the rule otherwise, an attempt to create a charitable trust would often fail to survive; that the intention of the donor is of great importance in determining the character of the trust; and that it is immaterial whether the gift is called charitable in the will itself, the real question being the effect and result of the trust. The question is not what the testator desired to accomplish by the trust, but what in the opinion of the court will be the result of the trust upon the community and society in general. The court should and generally does direct its attention merely to the question whether the net result of the trust in operation will be to advance the religious, educational, eleemosynary, governmental, or other charitable interests of the community and thus to produce the social advantage required for the charitable trust. Charity is necessarily altruistic, and involves the idea of aid or benefit to others; but, given the latter, the motive impelling it is immaterial. If the intention be charity, the court will execute it, however vaguely the donor may have indicated his purpose. Vagueness is to be found in almost every charitable trust. Courts of equity uphold gifts for a charitable purpose if there is a trustee with power to designate the particular persons to be benefited thereby, even though the will is vague as to the designated cestui que trust
or, in other words, that a gift to a charitable use will not fail of effect because the donor has not pointed out the particular beneficiaries to whom his bounty is to go, provided he has endowed some person with express or implied power to select such beneficiaries. The power to dispense the fund carries with it the implication *Page 66 
of power to select. While money or money's worth may go to certain individuals under a charitable trust, it does not go for the purpose of mere enrichment, but rather to produce a desirable social effect. The effect and result of the trust is that which is stressed in determining its validity. A court of equity, in construing a charitable trust, should lend its aid in attaining that end rather than let it fail because of doubt as to the means described by the testator.
A gift partly charitable and partly not must fall; the natural presumption is that a testator intends to dispose of his entire estate and does not intend to die intestate as to any part thereof, with the result that the law prefers a construction which will prevent partial intestacy, and this is particularly so when considering a residuary provision in a will.
The foregoing principles have been frequently affirmed by our courts and the authors of books on trusts, to the extent that citation of authorities therefor would seem to be unnecessary. See generally Hilliard v. Parker, 76 N.J. Eq. 447;74 Atl. Rep. 447; Johnson v. Bowen, 85 N.J. Eq. 76; 95 Atl. Rep. 370;Bruce v. Bruce, 90 N.J. Eq. 573; 107 Atl. Rep. 434; Noice v.Schnell, 101 N.J. Eq. 252; 137 Atl. Rep. 582; Sheen v. Sheen,126 N.J. Eq. 132; 8 Atl. Rep. 2d 136; Brooks v. Goff,127 N.J. Eq. 115; 10 Atl. Rep. 2d 466, and 2 Bogert onTrusts.
The four classes of definite charities outlined in the early decisions as being included within the charitable trusts are by no means exclusive. The courts hold open the door to admit as charitable any gift which produces extensive public benefit, even though it cannot strictly be classed as eleemosynary, educational, religious or governmental. 2 Bogert on Trusts 1209
§ 379.
 LAWNSIDE CEMETERY TRUST.
In paragraph 7, subdivision C, testator calls attention to the fact that he has founded and developed Lawnside Cemetery "as a lasting memorial to myself, and have provided for a Perpetual Care Fund from the proceeds of the sale of lots *Page 67 
by Lawnside Cemetery Association." He then says, "if said Perpetual Care Fund is not of sufficient amount to care for and maintain the cemetery as hereinafter set forth, I order and direct my Executors and Trustees to set aside a sufficient amount of my principal, and invest the same as hereinafter set forth, and pay from the income thereof a sum not to exceed Twenty five Hundred ($2,500) Dollars per year, which sum or sums added to the Perpetual Care Fund as above set forth will be sufficient for the purpose of beautifying said Cemetery by planting ornamental shrubbery and trees, and maintaining the fences, roads and other improvements, and keep the same in good condition, and keep the graves, markers and monuments in a good state of preservation. * * * When the said Cemetery shall become self supporting, the principal sum herein specified to be set aside shall become a part of my residuary estate."
The Snelbaker defendants call attention to the fact that testator does not refer to the perpetual care fund trust as a charitable one, but his declaration is not essential to the validity of the trust. The question is, notwithstanding this omission, does the court find it to be a charitable trust?
R.S. 8:2-30 provides that it shall be lawful for a person, by his last will and testament, to create a trust fund in perpetuity or for a lesser time where the income of the fund is to be used for the care or embellishment of any cemetery lot or grave thereof, c.
It is argued that what testator sought to do was to provide for the carrying on of his cemetery business perpetually, i.e., that he had been in the business of developing the cemetery, selling lots, c., and that he sought to perpetuate that business and created a private trust, in violation of the rule against perpetuities. In support of this it is argued that testator said he had developed the Lawnside Cemetery as "a lasting memorial to myself" and that in his will he directed that the stockholders of the cemetery employ Miss Swing, his secretary, as superintendent of the cemetery.
It has been repeatedly held that the motive of the settlor is immaterial, but that the effect and result of the trust should be conclusive, and that the mere fact that the settlor *Page 68 
has, by the creation of the trust, attempted to perpetuate his name is not to be considered, and as said in 2 Bogert on Trusts1110 § 364, "the settlor may have founded the trust solely to satisfy his family pride, for self-glorification, c.," but that the ultimate question still is whether the net result of the trust in operation will be charitable.
It is not true that testator directs the employment of Miss Swing by the stockholders of the Cemetery Association, but testator says "it is my suggestion" that she be employed.
It is next objected that the time for the contribution of the $2,500 a year is indefinite and that, therefore, the trust must fail.
The direction is that the income of the trust fund, not to exceed $2,500 a year, be turned over by the trustees to the perpetual care fund of the cemetery association until that fund created and to be added to by the cemetery association "will be sufficient for the purpose set forth in the will," i.e., maintaining, c., the cemetery. It is true that at the present time it cannot be ascertained when the perpetual care fund will be sufficient without the addition of the $2,500 a year, but the trustees will know or be advised of the condition of the perpetual care fund and when the time does arrive that that fund created by the cemetery association is sufficient for the purposes mentioned in testator's will, the trustees will, as directed by testator, return the corpus of the trust fund to the residuary estate. The testimony shows that the present amount of that perpetual care fund is $5,000 and that it may not be expended excepting by consent of the lotholders. R.S. 8:2-36.
The holding is that the perpetual care fund trust is valid and it seems clear that it was the intention of testator that the $2,500 to be paid each year is to be added to the income from the perpetual care fund and the combined fund be used in the upkeep and maintenance of the cemetery, and not that $2,500 a year should be added to the perpetual care fund and the interest arising therefrom be expended each year. See Stockton v.Newark, 42 N.J. Eq. 531; 9 Atl. Rep. 203; Bliss v. LindenCemetery Association, 81 N.J. Eq. 394; 87 Atl. Rep. 224. *Page 69 
Is the Snelbaker Home trust valid?
First, what was testator's intention as expressed in his will?
He calls attention to the fact that he had erected a dwelling house "of a suitable size and convenient to accommodate twenty-five or more guests." He then orders and directs "that said dwelling house be used for the purpose of establishing and maintaining a suitable HOME for the care and support of worthy
white women, of unquestionable character and moral reputation, whose age is not less than fifty years, and who were born in the County of Salem, New Jersey." In addition to these "worthy white women" who are to be admitted to the Home he provides "That any and all of the beneficiaries hereinabove named shall have the privilege of being guests in said Home, for and during the term of their natural lives." This would include all beneficiaries named in the preceding paragraphs of the will.
That testator considered this dwelling which he desired to become a memorial home as being a suitable property for that purpose and to be used for no other purpose is evidenced by his reserving this "Home" from the power of sale which he gave to his executors and trustees as to other real estate. In addition to this, he provided that his executors and trustees should have power to make alterations and improvements on any of his real estate and, if necessary, to make new erections, and also to purchase any necessary real estate, and further provided that in addition to their duties as executors and trustees "they shall personally devote their attention and the necessary time to successfully found, establish and supervise the carrying out of my desire in establishing and maintaining `The Ashbrook D. Snelbaker Home.'"
But even though it be apparent from the foregoing that testator desired to establish such a Home, did he legally accomplish that purpose? As said before, the question is not what the testator desired to accomplish by the trust but what, in the opinion of the court, will be the result of the trust upon the community and society in general? What would be the net result of such a trust as testator described? Would its operation advance the eleemosynary interest of the *Page 70 
community, remembering that the word "eleemosynary" is synonymous with "charitable" and that charity involves the idea of benefit to others? It appears that the trust, if put into operation, would result in the establishment of a "Home" for the "care and support of worthy white women * * * of not less than fifty years and who were born in the County of Salem," who must be in health,i.e., not requiring medical or hospital attention on admission, but having entered, would be so entitled. Who are "worthy?" The word is elastic. Its meaning must be construed in accordance with the text in which the word is used. The situation which testator had in view was a Home for white women over fifty years of age, born in Salem County, who the trustees might deem worthy of residence there. As said in Kronshage v. Varrell,97 N.W. Rep. 928, the word "worthy" may, perhaps more exactly, does — mean virtuous, or in good standing, but its restriction to such significance would be absurd when used in a will enjoining the trustees of the fund to select subjects worthy of assistance.
One definition of "worthy" as given by Webster's NewInternational Dictionary is "having worth or excellence, possessing merit; valuable, deserving of honor or the like." Another is of high station; of high social position, and yet another is "deserved, merited," and it seems evident that it was the latter meaning which testator ascribed to that word. Worthy of what? And the answer is, a home in which they may dwell and have their wants provided for, as well as medical care in case of illness, in others words, the beneficiary would be someone fitting the description given by the testator, deserving of this care and attention. It seems quite evident that one to be deserving of such a home and such provisions for his health and comfort must come within that class of women who, by reason of their financial condition, homelessness, age, or some other misfortune, are unable to properly provide these things for themselves. True it is that one, to be worthy, might have some means to supply themselves some of the things offered at the home. They need not be destitute, but be deserving, and the trustees must weigh the condition of health, wealth and position in life *Page 71 
to determine whether they are worthy. The result would be, if the trustees comply with testator's bequest, for the general social benefit of all women born in Salem County, over fifty years of age, c., and this result would be charitable, and if the court so sees it, the trust should be sustained. See Kitchen v.Pitney, 94 N.J. Eq. 485; 119 Atl. Rep. 675, and Fidelity UnionTrust Co. v. Reeves, 96 N.J. Eq. 490; 125 Atl. Rep. 582.
True it is that the testator provided that the beneficiaries named in the will should be admitted to the Home for the period of their natural lives. These beneficiaries may not presently be worthy in the sense above indicated, i.e., they are amply provided for either by annuities or gifts from testator's estate; but testator was dealing with a charitable institution of perpetual duration. For a time after his death his beneficiaries named in the will might enter the Home and enjoy its privileges,c., along with the "worthy white women" mentioned in the will, but the essential and eventual exclusive use is for the "worthy white women," c.
Those who are entitled to enter the Home as beneficiaries under the will are expressly confined by testator to "any and all beneficiaries hereinbefore named." This would include each beneficiary "named" in the will prior to paragraph 7D, in which testator provided for the Home establishment. Those so named are: Verna M. Swing, Mary A. Tuttle, Helen F. Snelbaker Zeigenfus, Ella S. Snelbaker Loveland, Wilson A. Snelbaker, A. Naomi Snelbaker, Elizabeth F. Snelbaker, William B. Snelbaker, I. Dayton Snelbaker, Sophia H. Applegate, Charles Tuttle and Arthur Loveland, all of whom were living at the time of testator's death.
It is quite evident that testator did not intend that the trustees of the Asbury M.E. Church or the corporate membership of Lawnside Cemetery be included, nor did he intend that "respective widows or wives" of testator's brothers, in item 7A be entitled to admission to the Home. He did not name them in the will as beneficiaries; he characterized them as "wife" and "widow." They were not "named." He designated them but he did not "name" them.
The inclusion of wives and widows of deceased children *Page 72 
for whom annuities had been provided, as set forth in the will might defeat the charitable trust and be held to create a private trust void as against perpetuities, while if a private trust was created for the beneficiaries "named" they are all in being and both the private trust and the charitable trust would stand. It was, of course, not the intention of testator to die intestate as to the Home property under consideration, and to decree a failure of the trust would bring about that result.
It must be remembered that in determining the validity of charitable trusts, if two modes of construction are fairly open, one of which would turn a gift into an illegal trust, while by following the other it would be valid and operative, the latter must be preferred. If there are two meanings of a word, one of which will effectuate and the other will defeat the testator's object, the court is bound to select that meaning of the word which will carry out the intention and object of the testator.
What part of the estate is to be used for the Home?
It is urged that testator has failed to designate what part of his estate shall be devoted to the Home, as well as to clearly set forth whether the trustees shall use income, principal or both.
A reading of the entire will discloses that testator provided that all of his debts should be paid, including federal, state and "inheritance or succession" taxes; he gave to Miss Swing 2,000 shares of General Foods stock; gave $10,000 each to three nieces and one nephew; $1,000 to a friend and $1,000 to a church, and then provided:
"All the rest, residue and remainder of my estate, real, personal or mixed, whatsoever and wheresoever situate, including all property over which I have any control or power of appointment, I give, devise and bequeath unto my executors and trustees hereinafter named, and their successors in office, in trust * * * (a) to set aside a sufficient sum of my principal estate, the income of which will be sufficient to pay" those annuities therein specifically set up; (b) to provide sufficient funds to erect markers for certain named persons; (c) to Lawnside Cemetery a fund of $2,500 per year until *Page 73 
that Association shall become financially able to maintain and beautify the cemetery, c.; (d) to establish the Snelbaker Home.
As to the annuities provided for in (a), testator provided that on the death of the last annuitant all of the annuity corpus
should go to residue, and as to the corpus of the Lawnside Cemetery trust fund, he provided that when that Association should become financially able to carry on the work for which the trust fund was created, this corpus should go to residue.
From the foregoing (a) to (d) inclusive, we see that testator devoted all the residue of his estate to the four purposes above mentioned, and as to the annuities and cemetery funds, he directed that after the corpus had served its purpose it should go to residue, so that it would seem that there may be no question that testator intended that his entire residuary estate, as dealt with in the residuary clause, should go to the Snelbaker Home at the end of the annuity period and when the cemetery should be possessed of sufficient funds to carry on. He therefore gave to his trustees this residue for the purpose of the Home, so that the income from the fund could be used for the purposes of the Home, with directions to the trustees that in case there should be more guests than the Home could comfortably provide for that they, in their discretion, if there "shall be sufficient funds in hand" should enlarge the Home to accommodate additional guests.
It is true that testator, in providing for the Home, directed that the dwelling house on Main Street be used for the purpose of establishing and maintaining the Home, and that he did not, in words, say that the Home should be maintained and operated through the use of his residuary estate, but that he so intended there can be no doubt from a reading of the entire will. He said that he desired the Home to be established and maintained for the care and support of worthy white women, and while he did not say that he desired the Home to have perpetual existence, it is evident that he so intended when he suggested the formation of a non-profit eleemosynary corporation. He further provided that the guests of the Home were to be treated "as if they were guests *Page 74 
in my own home," thereby indicating his intention that the guests should not only be housed, but fed. He further provided for the medical and hospital care of his guests, and unquestionably the trustees are empowered to use the entire residuary estate for the accomplishment of this purpose, and to the same extent as if the will had directly authorized them so to do. In no other way could the ultimate intent of the testator be carried out with regard to the Home. Testator did not limit his trustees in the manner in which his entire residuary estate should be used for the Home purposes. He knew, of course, that in the establishment of the Home in the first instance his trustees would probably have to resort to corpus for alterations, furnishings, equipment, c. What he evidently intended was that his trustees exercise their best judgment so that the Home would serve its social purposes in perpetuity. This raises the question as to whether or not, should the trustees determine to enlarge the Home, they may use for that purpose corpus as well as income. This question deals with something that is not presently before the trustees for decision and it is not necessary to be answered at this time. But it may be well to note, as said by Bogert on Trusts 1787 § 559, that advice will not be given nor will the court discuss problems that may never arise or difficulties which are to confront the trustees at a remote date. However, it is evident that the trustees in the exercise of their discretion as to enlargement of the Home, would be derelict in resorting to corpus and thus depleting income and thereby possibly preventing the perpetual existence of the Home, which testator established in perpetuity.
The purpose was to use the available home to accommodate as many as it could comfortably house and for that purpose to use all the residue of testator's estate to the extent it would suffice. If a fund accumulated in the hands of the trustees from surplus over operating and maintenance of the Home to the extent to warrant additions, and a worthy lot of applicants for admission existed, then to add to the Home, and not otherwise.
The result is that the Home trust is upheld as valid.
The foregoing disposes of the controversial problems which *Page 75 
the parties have presented for decision. The remaining questions are discussed in a supplement hereto.
A decree may be presented on notice, at which time the question of counsel fees may be discussed.