By this bill a construction of the last will and testament of William Brokaw Bamford and instructions to the complainant executor are sought. The testator died a resident of Monmouth County, on April 10th, 1945, and his will was duly probated in the Monmouth County Surrogate's Court on June 12th, 1945, on which date letters testamentary and of trusteeship were issued to the complainant. Paragraphs "First" to "Fourth," inclusive, of said will are not in controversy. Instructions are sought with reference to the expenditure of $15,000 for the typing, editing and distribution of what the testator called his "Random Scientific Notes Seeking the Essentials in Place and Space," as provided for in paragraphs "Fifth" to "Ninth," inclusive. The main controversy, however, centers around paragraph "Tenth" of said will and the proper construction thereof and paragraphs"Eleventh" and "Twelfth" of said will are also involved. Paragraphs "Thirteenth" to "Thirty-second," inclusive, provided for various bequests of money or specific property. Paragraphs "Thirty-third" and "Thirty-fourth" provide for the distribution of the rest, residue and remainder of the estate and the creation of a trust, of which more hereafter. The will was executed on January 20th, 1931, and there was *Page 102 
a codicil thereto, executed on November 22d 1944, but the provisions of the codicil need not be considered in the disposition of the controversy here involved.
In addition to numerous specific bequests of personal property, and the residue of the estate disposed of by paragraph"Thirty-third" of the will, the testator made pecuniary bequests amounting to $185,000 and directed the expenditure of $17,500 more for various purposes, the cash requirements of the will amounting to $203,000. The gross value of the estate is approximately $137,000. After the payment of uncontested legacies, the making of expenditures not in controversy and the payment of inheritance and estate taxes, there will be left, for distribution and administration expenses, approximately $100,000.
For a clearer understanding of this controversy the essential provisions of paragraphs "Fifth" to "Twelfth," both inclusive, are herein set forth as follows:
"Fifth: I direct my executors as among their first and most important duties to have typed at least four copies of my several volumes of loose leaf typed notes entitled `Random Scientific Notes seeking the Essentials in Place and Space' or by whatever other title I may designate them; and I further direct my executors to deposit each of said four copies in a safe and secure place in widely separated municipalities to prevent loss of the original manuscript record. After this has been done, I further direct my executors to have my said `Random Scientific Notes' adequately edited by some specially qualified person or persons and then have one hundred copies of such edited edition typed or printed. After the disposition of certain copies as hereinafter directed, I direct that the remaining copies shall be placed by my executors with such persons or institutions as may seem to them wise or advantageous. I further authorize and direct my executors to expend the sum of Ten Thousand Dollars ($10,000) or as much as may be reasonably necessary for the above purpose.
"Sixth: If the researches as outlined in my `Random ScientificNotes' have any practical value, they are for the use and benefitof all mankind. To permit of an impartial analysis of such researches, I give and bequeath to the National Academy of Sciences at Washington, District of Columbia, the sum of Five Thousand Dollars ($5,000): provided, however, that the Academy will agree to select, direct and compensate two or more scientists or other specially qualified persons to study, investigate and review the researches as outlined in my said notes; to assist, if desired by my executors, in the editing of such notes; and to submit a typed copy of their findings and conclusions to my executors and to each of the several institutions mentioned in Paragraph Ninth of this my will. *Page 103 
 "Seventh: I direct my executors to have my `Random Scientific Notes' copyrighted in the United States, in Great Britain, in France, in Germany and in Italy to protect them in the interest of my legatees. Such copyright shall not be used to prevent abstracts from being reprinted from the edited edition of such notes provided proper credit and acknowledgment is given therefor.
"Eighth: I direct my executors to deposit a copy of the edited edition of my `Random Scientific Notes' in the Library of Congress at Washington, in the Library of the British Museum at London, in the Biblioteque Nationale at Paris, in the National Library at Berlin and in the National Library at Rome.
"Ninth: After my `Random Scientific Notes' have been properly edited and copied as provided under Paragraph Fifth, I authorize and direct my executors to designate a day for the beginning of the option to the bequest and trust as provided under Paragraph Tenth for the establishment of the `Exton-Bamford Research Fund.' I further direct that my executors shall, at least thirty days before such designated day, send formal notice of such designated day together with a copy of my last will and of the edited edition of my said `Random Scientific Notes' to each of the following institutions; The National Academy of Sciences at Washington, District of Columbia; Princeton University at Princeton, New Jersey; Harvard University at Cambridge, Massachusetts; the California Institute of Technology at Pasadena, California; the American Philosophical Society at Philadelphia, Pennsylvania, and the League of Nations at Geneva, Switzerland.
"Tenth: I give and bequeath to the National Academy of Sciences at Washington, District of Columbia, all right, title and interest to the researches contained in my manuscript notes entitled `Random Scientific Notes seeking the Essentials in Place and Space' or by whatever other title I may designate them, also to the edited edition of such notes, and to all motion picture films and equipment and all other scientific data and equipment supplemental to such notes, together with the sum of One Hundred and Fifty Thousand Dollars ($150,000), which sum shall include the trust fund mentioned in the second paragraph of the last will and testament of my Mother, Catherine J. Bamford, which said will was duly filed in the office of the Surrogate of Monmouth County on September 28, 1927, and in which I have been given power to dispose of said fund and by my last will and testament I intend to exercise said power to me given in said will, and in the exercise of said power do hereby direct that said fund shall be and become a part of said sum of One Hundred and Fifty Thousand Dollars ($150,000), IN TRUST, NEVERTHELESS, as fully as may be permitted by the laws of the State of New Jersey, for thefollowing purposes and under and upon the following terms and conditions, to wit: The trust to be designated as the `Exton-Bamford Research Fund.' To invest and reinvest theprincipal and to use the income thereof in some fitting manner tocontinue and carry forward to a completion and to publish forpopular understanding the results of the researches contained oroutlined in my manuscript entitled `Random Scientific Notesseeking the Essentials in Place and Space' or by whatever *Page 104 
future title I might designate them; subject, however, to the provisions that the National Academy of Sciences shall within twelve months after the date as provided in Paragraph Ninth to be designated for the beginning of this option, agree to accept the provisions of this bequest and trust and shall within a period of thirty-six months after such designated date raise an additional sum of One Hundred and Fifty Thousand Dollars ($150,000) to be added to the principal and the income of which shall be used forthe same purpose as stipulated for the trust hereinbefore provided. In the event that the National Academy of Sciences shall decline or neglect or be unable to accept or to fulfill the provisions of the said bequest and trust, then I give the bequeath to Princeton University at Princeton, New Jersey, the aforesaid bequest and trust for the same purposes and under the same terms and conditions as above mentioned, excepting that the period within which the said Princeton University must exercise its right of acceptance shall be within thirteen months after the date as provided in Paragraph Ninth to be designated for the beginning of this concurrent option."
(Then follow successive alternate bequests of the "Notes," c., and the fund, to Harvard University, the California Institute of Technology and the American Philosophical Society of Philadelphia, "for the same purposes" and under like terms and conditions.)
Paragraph "Tenth" then continues as follows:
"In the event that all of the aforesaid institutions shall respectively decline or neglect or be unable to accept or to fulfill the provisions of the aforesaid bequest and trust, then I give and bequeath to the League of Nations at Geneva, Switzerland, the aforesaid bequest and trust for the samepurposes, but upon any satisfactory terms and conditions by whichthe League will agree to endeavor to carry out the purposes ofthis bequest and trust so that the results may be of benefit tothe entire world. Such work may be done by the League's own staffor by assignment to scientists or other qualified workers whobelieve that the common good of the worthy and meritorious of allmankind is greater than that of an isolated part. * * * In the event that the League of Nations shall decline, neglect or be unable to accept or to fulfill the provisions of the aforesaid bequest and trust, then I give and bequeath to Princeton University of Princeton, New Jersey, the aforesaid bequest and trust for the same purposes and under the same terms and conditions as above mentioned for the League of Nations * * *. If any unexpected contingency should arise by which the designated date as established by Paragraph Ninth or the periods of time herein stipulated would work an injustice to or hardship upon any of the various institutions mentioned in this paragraph of my will, then, at the request in writing from any one of such institutions, I authorize my executors to equitably change such *Page 105 
designated date or extend such periods of time so that they shall be just and fair, and shall be accepted as such in writing by any two of the aforementioned institutions. In the further event that a mutually satisfactory agreement cannot be so reached, then I authorize a court of competent jurisdiction to equitably change such date or extend any of the periods of time mentioned in this paragraph if necessary or desirable to better carry out thespirit and intent of this my will.
 "Eleventh: In order that my records and papers may be carefully preserved, gone over and sorted for proper final use so that my life's work may not be inadvertently destroyed by hasty thoughtlessness or lack of understanding in an attempt to distribute the personal property of my estate, I authorize and direct my executors to maintain my estate intact and to make no distribution thereof until after the preceding provisions of this my last will have been fully carried out. To better accomplish this purpose, I further authorize and direct my executors to maintain an office and to keep my home and personal office open and in proper working order under their personal supervision or that of some competent person or persons for as long as reasonably necessary and to pay all proper expenses and salaries incident thereto out of the income of my estate.
"Twelfth: To anticipate the possibility of some unforseencontingency which at any time should reduce the cash value of myestate so that the amount available would not be sufficient topay in full all the bequests herein enumerated, I direct and authorize my executors to first fully comply with and carry out all the provisions of the preceding paragraphs of this my will, and to prorate whatever sum may then be available among the remaining bequests as enumerated in the following paragraphs of this my will. It being my intention that none of the following bequests or inheritances shall become effective and operative, due or payable until after the provisions of the preceding paragraphs of this my will have been fully complied with. Thefollowing bequests and inheritances shall thus be considered asbeing embraced within a special or provisional residuum of myestate. The work of many years has firmly convinced me that noact of mine or my heirs or assigns should prevent the propercompletion, for world benefit, of the obligation and duty whichhas been imposed upon me or placed within my range ofunderstanding to make, complete and publish the result of theresearches outlined within my `Random Scientific Notes.'" (The italics in the foregoing excerpts are mine.)
The bill of complaint alleges that the net value of testator's estate will be approximately $104,000, and that while the complainant is prepared to expend the $15,000 for the typing, editing and distribution of the "Random Scientific Notes," as provided for in paragraphs "Fifth" to "Ninth" of the will, he has been advised and believes that such expenditure would serve no useful purpose and that such expenditure would be *Page 106 
a waste of money, because the so-called "Random Scientific Notes" are irrational, meaningless and of no value whatsoever; that the papers containing said "Notes" are worthless; that there is, therefore, no necessity to maintain and keep open testator's home and personal office; that the estate is insufficient to set up the trust fund provided for in paragraph "Tenth" of the will, and that he believes that none of the parties mentioned in paragraph "Tenth" of the will will accept the trust and bequest and comply with the conditions thereof.
The defendant National Academy of Sciences, of Washington, District of Columbia, has filed in this cause a renunciation of all rights under testator's will and rejects and declines to accept the gifts, legacies and bequests to which it might become entitled thereunder.
The defendant Princeton University has answered, declining to accept the trust under the conditions imposed by paragraph"Tenth," alleging that it is inconceivable that any of the legatees mentioned in said paragraph will accept said bequest on the conditions named; that the "Random Scientific Notes" are of no scientific value; admits that the typing, editing and distribution of said "Notes" would serve no useful purpose; alleges that the will discloses a general charitable intent on the part of the testator and asks that this court apply the cypres doctrine and turn over the trust fund to Princeton University as a gift to the Department of Philosophy to be used for philosophical investigations and research.
The defendant John Owens has answered the bill of complaint, alleges that the so-called "Random Notes" are worthless and meaningless; that the expenses of typing, editing and distributing them would be a waste of money and against public policy; that the trust set up in the "Tenth" clause of the will is illegal and invalid because it violates public policy, is not a charitable trust and violates the rule against perpetuities. This defendant also claims that the legacies, bequests and devises contained in the paragraphs of decedent's will subsequent to paragraph "Twelfth" are invalid and ineffective because they were conditional upon the full performance of all of the provisions contained in the preceding eleven *Page 107 
paragraphs thereof; and further claims that the testator died intestate and that, except for the bequests to those persons interested under the first four paragraphs of the will, the estate should be distributed amongst the next-of-kin of whom he is one. All of the remaining next-of-kin have entered their appearance in this cause and submitted to the jurisdiction of this court.
The defendant Asbury Park National Bank and Trust Company has answered, admitted that the expenditure of the $15,000 for typing, editing and distributing the so-called "Random Notes" would be a waste of money; joins in the prayer for construction of the will, and agrees to accept the trusts thereby established in which this defendant is named trustee. The defendant Monmouth Council Boy Scouts of America has answered the bill of complaint and joins in the complainant's prayer for a construction of said will. The defendants trustees of the Belmar School District, trustees of the Belmar Public School Library and the estate of Dr. Fred V. Thompson and Grace A. Thompson, have entered their respective appearances in this cause and submitted to the jurisdiction of the court. A decree pro confesso has been entered against all other defendants.
The evidence submitted at the final hearing shows that the League of Nations has refused to accept any bequest under this will and has advised complainant's solicitors that all of its affairs have been turned over to the United Nations, which organization has also declined and refused to accept any bequest under the will.
The trustees of the Old Barracks, Trenton, New Jersey, legatees of certain furniture and personal property, under paragraph"Twenty-second" of the will, have renounced and refused to accept said legacy.
Testator's so-called "Random Scientific Notes seeking the Essentials in Place and Space" consist of eight volumes of loose-leaf notes and one manila folder, partly typed and partly in the handwriting of the testator. After the probate of the will and complainant's qualification as executor, he examined these "Notes" and, being unable to make any sense out of them, submitted them to Dr. Robert Scoon, a professor of *Page 108 
philosophy at Princeton University, who examined them and pronounced them as worthless, giving his opinion that their publication would serve no useful purpose. Dr. Scoon testified at the final hearing in this cause and his written report of his examination of the "Notes," which was made to the complainant's solicitors before this bill was filed, was offered in evidence. In that report he said:
"In my judgment there is practically nothing in them that could properly be called `scientific' and a large proportion of them have no reference to `place and space' at all. They are so `random' that it has been impossible for me to unify them into any consistent theory. * * * The net result is that I think publication of these notes would serve no useful purpose. In the main, they are not coherent or intelligible enough to form a contribution to existing knowledge; and where they are coherent and intelligible, they are neither disciplined nor valuable. In my judgment the cost of publication would be a waste of money."
These "Notes" were also submitted to Professor John Winkelman, a Doctor of Philosophy, formerly an instructor at Rutgers University and now a professor of philosophy at the University of Missouri. He also testified at the final hearing to the effect that he had read every word of the entire collection of "Random Notes" and he had made an intensive study of them from beginning to end, and had come to the conclusion that they were irrational, unintelligible and contained nothing new of educational value; that it would be of no benefit to mankind to edit or publish the "Notes;" and that the expenditure of $15,000 for that purpose would be a waste of money. Professor Winkelman's opinion of the "Notes" is summarized on the last page of his report, as follows:
"Of the entire work I can say that it represents the work of a mind ingenious enough to originate and use with complete consistency a complicated system of terminology. However, this mind, although ingenious, is untutored and grotesquely over-ambitious. Bamford took up and attempted to fuse such a large number of separate topics that no topic is thoroughly treated, no topic is correctly understood, and no topic is carried to the point where it might be said to suggest new avenues for study; all is superficial, nothing is based on thorough knowledge and background. It has a private, subjective significance and no other. Such was Bamford's megalomania that he familiarized *Page 109 
himself with a few terms of a subject and then pretended to a complete knowledge and contempt of the entire body of writings on that subject. As a result, the `Random Notes' are completely devoid of any value, whether as science or as anything else."
Professor Winkelman also stated that two representatives of the National Academy of Sciences examined the "Notes" in his presence and concurred in his opinion that they were of no value whatever. When asked on cross-examination if these "Notes" disclosed that the author was suffering from delusions of grandeur or anything of that sort, Professor Winkelman said that the author had "an exaggerated opinion of his own competence," "considered himself superior to the science as now known, and set out to write a new type of science," and that his condition closely approached the state of megalomania. Also, that even a cursory examination of the "Notes" indicates that he had "a mania or passion for, or for doing great or grand things" and that he had "grandiose delusions." That this characterization was apt is, I think, definitely indicated by the following paragraphs from excerpts from Volume 2 of said "Notes:"
"To test my own capacity to observe and think correctly I did not start any reading or research into the work of others until after I had evolved or there had been evolved by the sequence of events, a series of hypotheses.
"I began `reading with a purpose' the records of the recognized masters. My astonishment was intense when I found that that majority of `wildest' thoughts had already been anticipated and recorded by the world's best thinkers. This gave me the necessary courage to continue along the lines of what might prove to be original and uncharted lines."
It is thus clear that he was astonished to find that anyone had ever entertained such lofty thoughts and ideas as his. In his report, Professor Winkelman says, "Of interest is the fact that in Volume 1 the author raises the question of his own sanity." But that question or issue is not involved in this cause.
There was introduced in evidence, as Exhibit D-1, a copy of a so-called summarized outline or synopsis of the notes — said by counsel for Princeton University to have been typed by the executor after testator's death, and from his (testator's) *Page 110 
dictation shortly before his death. The original of this summary is with other "Notes" in the "manila folder" which was offered in evidence. A pencil notation at the top of the first page, said to be in the executor's handwriting, is as follows: "Typed for W.B.B. from his dictation 4-15-45 as a summary statement of the conclusions of his `researches.' C.P. Wilber." The testator died April 10th, 1945. Evidently the summary was dictated prior to his death and transcribed after that event. There is in this same folder, however, five pages of notes in testator's handwriting entitled, "Cosmology in Brief, By William B. Bamford," together with several typewritten copies. The summary or synopsis,Exhibit D-1, is evidently a revision of the original article entitled, "Cosmology in Brief." The complainant testified that he found the summary or synopsis among the testator's notes in his safe at his home after his decease. This summary or synopsis is here quoted in full for what it is worth:
"The history of mankind is so full of the failure of man to meet reasonable standards of rational life, that any help to improve such conditions unquestionably has real value. The present world conditions and the critical post-war problems of world wide adjustments present a challenge to any thinking which offers promise of improved human relationships.
"The thinking indicated in the following material seems to offer a new approach to some of the fundamental motivation controlling the relationships of men and nations.
"It is offered in the belief that it does promise something that has value and which at least deserves immediate and thorough consideration in view of existing world conditions.
"A division of concepts into three probables rather than two possibles is much more rational. An explanation on the basis of this reasoning of this origin of being would permit of the following classifications to explain origin.
"1. Chance: or the development of being from chaos entirely by casual action.
"2. Choice: or the creation of being by some pre-existent causal will.
"3. Compulsion: or the origin of being, be-cause there was a necessity unexplained and undefinable which requires thatsome-thing be which is unavoidable, because chance as the first probable cannot be reconciled with the orderly process of nature under law and is therefore eliminated. No-thing can notbecome being.
"There is a fundamental condition of being to which everything is subject, which for convenience might be calledspiritual, from a *Page 111 
religious stand point or isting or sisting, from a material
standpoint. From the material standpoint everything must be supported or sustained by something. These Pro-Searches are defined as Subsisting. (animate or inanimate)
"The condition of sub sisting cannot be rational unless it supports and sustains some-thing. That some-thing in its highest form must be ex-isting. Man must be considered the highest expression of existing, a combination of spiritual and material factors. Man, because of this unique position, must, if the process is rational, be subject to a process of development in rationality, looking toward an ultimate in greaterperfection.
"This achievement is impossible in what is commonly called mortal life. To be rational, therefore, the process must continue after what is commonly called death. There must therefore, be some subsequent period of development in which the individual human can continue upward growth. For convenience, this Pl-ace
is termed Paradise, a realm in which Personal existance (Material and Spiritual) continues until such time as the individual is prepared for advancement to a final condition of Personal (Material and Spiritual) existance in a Place which is termed Heaven. In this final realm, the individual existance may continue growth for a period determined by the individual's capacity.
"This concept if true has power of itself to help the individual here; it also offers greater incentive to men and nations for mutual living in equity."
Dr. Scoon said a part of it was understandable and a part not; and I agree.
All parties who appeared and all counsel are in agreement that these "Random Notes" are irrational, unintelligible, of no scientific or other value, and that the expenditure of $15,000 for their typing, editing and distribution would be a waste of money, and in this opinion I concur. The complainant is, therefore, instructed that he should not expend this sum or any other sum for that purpose.
This brings us to a consideration of paragraph "Tenth" of the will.
It is conceded, I believe, by all parties here represented, that unless the trust established by paragraph "Tenth" of the will is a charitable trust, it is void as violative of the rule against perpetuities. Our first problem is, therefore, to determine whether or not this trust is of a charitable nature. If it is not, it fails. If it is, then we must next determine if its purposes can be carried out according to the testator's intent and, if not, whether the doctrine of cy pres should be applied *Page 112 
as urged on behalf of Princeton University. Of the parties to this suit it is only Princeton that contends that the trust is charitable.
The beneficiaries of this trust are named by the testator in the alternative, successively, as follows:
The National Academy of Sciences, at Washington, District of Columbia.
Princeton University at Princeton, New Jersey.
Harvard University at Cambridge, Massachusetts.
The California Institute of Technology at Pasadena, California.
The American Philosophical Society of Philadelphia, Pennsylvania.
The League of Nations at Geneva, Switzerland.
The benefits of the trust in so far as the first five institutions named are concerned are conditional upon the one accepting such benefits adding an additional sum of $150,000 to the trust fund to be used for the same purposes as designated by the testator. If all of these five institutions decline or neglect to accept the benefits and conditions, then the League of Nations may accept the bequest upon any terms and conditions satisfactory, as I understand the language of the will, to the executors; and, if the League declines, then Princeton University may take under like "satisfactory" terms and conditions.
Paragraph "Ninth" of the will provides that after the testator's "Notes" have been edited and copied, the executors are to designate a day for the beginning of the option to accept the bequest and trust and, at least thirty days before such designated day, notice thereof, with a copy of the will and of the edited edition of the "Notes," shall be sent to the above-named institutions, which institutions have certain times within which to accept the bequest and conditions, as follows:
 The National Academy of Sciences ......... 12 months
 Princeton University ..................... 13 months
 Harvard University ....................... 14 months
 California Institute of Technology ....... 15 months
 The American Philosophical Society ....... 16 months
 *Page 113 
The proofs do not show that such notice has been given, but complainant, in paragraph 13 of the bill, requests that if the trust under paragraph "Tenth" of the will is held valid the court direct those institutions which have not already declined, to signify in proper form in this suit their acceptance or rejection.
The "purposes" of the trust are stated in paragraph "Tenth"
to be "to invest and re-invest the principal and to use the income thereof in some fitting manner to continue and carryforward to a completion and to publish for popular understanding
the results of the researches contained or outlined in my" notes. All counsel agree that so far as the express purpose of this trust is concerned it is impossible of performance; that the "Notes" amount to nothing; that the results of the so-called researches are negative, and that no structure, educational or otherwise, can be built thereon; also, that the publication of these "Notes" for "popular understanding" is not only useless (Dr. Scoon says that not more than 1% of them are intelligible or understandable), but impossible.
A trustee is under no duty to comply with the terms of a trust where compliance is impossible. 2 Scott on Trusts 831 ¶ 165.
It is not necessary, therefore, for the executors to designate a day for the beginning of the option or to give the notice required by paragraph "Ninth" of the will. Nor is it necessary for the court to direct the institutions named in that paragraph to accept or reject the bequest. A copy of the will has already been sent to all of them. Two of them — the National Academy of Sciences and Princeton University, have declined the primary conditional bequest; none have accepted or indicated any inclination so to do. The League of Nations, or its successor the United Nations, has declined the secondary bequest; and so has Princeton, except that the latter institution offers to accept the money bequest on condition that the cy pres doctrine be applied and that the fund be used for research and study in its department of philosophy, the purposes of which are claimed to be akin to the researches of the testator. *Page 114 
All counsel, except counsel for Princeton, contend that the bequest in trust contained in paragraph "Tenth" is a mere private trust; that testator's paramount and primary consideration was the publication of his "Notes," and that this purpose was not subordinate to any general charitable intent, and that the fact that he thought they might be of "world benefit" was immaterial, because publication was the vital and essential purpose; that the publication, the propagation or preservation of his "Notes" was the end itself; that testator's interest was not in general philosophical research, but in "his" researches, and in getting his ideas published; that his intent and purpose was solely the propagation and continuance of his own work and not a general intent to encourage research by others and the development of theories which might be inconsistent with or unconnected with his own. And it is argued that there are two basic prerequisites for the invocation of the doctrine of cypres — first, there must exist a general charitable intent to which the means of accomplishment is subordinate; and, second, that the trust must be charitable in the first instance.
The question then arises — what is a charitable trust the failure of which will justify the application of the cy pres
doctrine? This question must be answered in the light of applicable decisions of our courts.
In MacKenzie v. Trustees of Presbytery of Jersey City,67 N.J. Eq. 652, Mr. Justice Green, speaking for the Court of Errors and Appeals (at p. 665), quoted with approval the following definition of a charity as stated by Mr. Justice Gray of the Massachusetts Supreme Court, in Jackson v. Phillips,96 Mass. 539, 566:
"`A charity, in its legal sense, may be more fully defined as a gift, to be applied, consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint; by assisting them to establish themselves in life; or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government. It is immaterial whether the purpose is called charitable in the *Page 115 
gift itself, if it be so described as to show that it is charitable in its nature.'"
In Noice v. Schnell, 101 N.J. Eq. 252, the will stated:
"It is my desire and intention to dispose by gift of a large part of my remaining estate for the purpose of pleasing Almighty God, benefiting my fellow-man, and as far as possible developing * * * the Palisades."
The residue of testator's estate was left in trust "to maintain and develop in accordance with my known wishes, the Palisades," * * *. This was held to be a charitable purpose and the gift to constitute a valid charitable trust. It was also held that in determining the character of a bequest, the court's attitude should be in favor of the charity rather than against it, and that the bequest should be considered as a charitable trust if it can be done within the principles of law relating to such bequests. Also, that if a donor's intention be charity, a court will execute the intention of the donor even though he may have indicated his purpose vaguely and in general language. Mr. Justice Katzenbach, speaking for the Court of Errors and Appeals on that case (at p. 257), said:
"It should also be remembered that the court's approval of the object selected by the testator for his benefaction is not a factor to be taken into account in determining the validity or non-validity of the bequest."
And at page 259 he referred to and quoted with approval the following definitions of a public charity:
"The definition of a public charity given by Horace Binney in his argument before the United States Supreme Court in theGirard Will Case and adopted by the court (Vidal v. Girard,43 U.S. 127; 11 L.Ed. 205), is one of the most striking. It is as follows:
"`Whatever is given for the love of God or for the love of your neighbor in the catholic and universal sense — given from these motives and to these ends — free from the stain or taint of every consideration that is personal, private or selfish.' * * *
"`Charitable trusts include all gifts in trust for religious and educational purposes in their ever-varying diversity; all *Page 116 
gifts for the relief and comfort of the poor, the sick and the afflicted, and all gifts for the public convenience, benefit, utility or ornament, in whatever manner the donors desire to have them applied.' 2 Perry Trusts (5th ed.) 314. * * *
"Another condensed definition is that of Mr. Justice Swain inOuld v. Washington Hospital, 95 U.S. 311, which is given in these words: `A charitable use where neither law or public policy forbids may be applied to almost anything that tends to promote the well-doing and well-being of social man.'"
The holding that the trust there involved was charitable was based mainly, I think, upon the testator's statement of his "purpose of pleasing Almighty God, benefiting my fellow-man,"c., and it must be conceded that a trust for the benefit of mankind generally, is a charitable trust.
In Restatement of the Law, tit. "Trusts," Topic 3 — Nature ofCharitable Purposes, we find the following:
"Section 368. WHAT PURPOSES ARE CHARITABLE.
"Charitable purposes include
"(a) the relief of poverty;
"(b) the advancement of education;
"(c) the advancement of religion;
"(d) the promotion of health;
"(e) governmental or municipal purposes;
 "(f) other purposes the accomplishment of which is beneficial to the community.
"COMMENT:
"a. * * * the common element of all charitable purposes is that they are designed to accomplish objects which are beneficial to the community.
"d. If the purposes to which the property is by the terms of the trust to be devoted are charitable purposes, the motive of the settlor in creating the trust is immaterial.
"Section 370. ADVANCEMENT OF EDUCATION.
"Comment:
"a. Trusts for the promotion of education include trusts * * * to promote the advancement of knowledge by research; to promote the dissemination of knowledge or of beliefs by the publication of books and pamphlets or the delivery of lectures."
In Woodstown National Bank, c., Co. v. Snelbaker, 136 N.J. Eq. 62;
affirmed, 137 N.J. Eq. 256, Vice-Chancellor Sooy in discussing the character of the trust there involved, and with his usual perspicuity concisely summarizes the essential *Page 117 
requirements of a charitable trust. And, (at p. 67), he said:
"It has been repeatedly held that the motive of the settlor is immaterial, but that the effect and result of the trust should be conclusive, and that the mere fact that the settlor has, by the creation of the trust, attempted to perpetuate his name is not to be considered, and as said in 2 Bogert on Trusts 1110 § 364, `the settlor may have founded the trust solely to satisfy his family pride, for self-glorification, c.,' but that the ultimate question still is whether the net result of the trust in operation will be charitable."
And (at p. 72):
"* * * if two modes of construction are fairly open, one of which would turn a gift into an illegal trust, while by following the other it would be valid and operative, the latter must be preferred."
In In re Butler, 137 N.J. Eq. 48; affirmed, 137 N.J. Eq. 457,
it was held that the question is not what the testator desired to accomplish, but what will be the result of the trust upon the community and society in general.
In M'Caig v. University of Glasgow, 21 Ch. Div. 667, Lord Kyllachy said that a disposition which serves no other purpose than that of perpetuating at great cost and in an absurd manner the idiosyncrasies of an eccentric testator, is invalid.
If the bequest and trust in paragraph "Tenth" is charitable it must, in my judgment, come under the head of the "advancement of education." Restatement, supra.
While "in all probability, no court would sustain a trust to propagate plain nonsense or folly, even though it were labeled educational by its author" (Bogert on Trusts, § 374), "it is only when the court is convinced that the purposes of the trust can serve no rational object that the court will declare it invalid." Girard Trust Co. v. Commissioner, 122 Fed. Rep.
2d 108.
In construing the will, and in determining the character of the trust created by paragraph "Tenth" thereof, we must bear in mind that a will must be construed from its four corners. If, on a consideration of the whole will, a general charitable intent or purpose is inferable, the bequest in trust *Page 118 
must be held valid; and in determining the question of charitable intent or purpose, we can not confine ourselves to the language of any particular clause of the will or of any isolated expressions therein. If, taken as a whole, the will indicates a general charitable intent or purpose, then effect should be given to that intent notwithstanding the particular paragraph establishing the trust does not clearly express it. A careful reading of the will discloses the following expressions in various paragraphs thereof, indicative of his general charitable intent:
"Sixth: If the researches as outlined in my `Random Scientific Notes' have any practical value, they are for the useand benefit of all mankind."
 "Tenth: * * * to use the income * * * to publish for popular understanding the results of the researches contained or outlined in my manuscript * * * to carry out the purposes of this bequest and trust so that the results may be of benefit to the entireworld. Such work may be done by the League's own staff * * * or other qualified workers who believe that the common good of theworthy and meritorious of all mankind is greater than that of an isolated part."
"Twelfth: The work of many years has firmly convinced me that no act of mine or my heirs or assigns should prevent the proper completion, for world benefit, of the obligation and duty
which has been imposed upon me or placed within my range of understanding to make, complete and publish the result of the researches outlined within my `Random Scientific Notes.'" (Italics in these quotations are mine.)
The "obligation and duty" mentioned in paragraph "Twelfth"
was that which he evidently thought he owed to mankind in general.
In paragraph "Thirty-third" the testator devises and bequeaths the residue of his estate in trust for purposes some of which, at least, are clearly charitable, and provides that the "income * * * shall be used and applied to promote the wellbeing of mankind." While this language is applicable only to the "Exton-Bamford" trust set up in this paragraph, it does indicate that the testator was interested in promoting "the well being of mankind.".
Other indicia of the general intention of the testator to dispose of most of his estate for charitable purposes are found in the bequests made in paragraphs "Thirteenth," "Fourteenth," *Page 119 "Twenty-sixth," "Twenty-eighth," and perhaps others. These bequests are clearly for charitable purposes, and while they in no way add to or modify paragraph "Tenth," they do indicate a charitable frame of mind or mental attitude from which a general charitable intent may reasonably be inferred.
By the concluding sentence of paragraph "Tenth" the court is authorized to extend the time for acceptance of the bequest or performance of any condition "if necessary or desirable to better carry out the spirit and intent of this my will." And in paragraph "Thirty-third" the testator said: "* * * or such income may be applied to the use and benefit of any worthycharitable, benevolent or educational purpose; * * * following
where reasonably possible the spirit of the various provisionsof my will or of my `Random Notes.'" (The italics in the quotations are mine.) Of course, it is the "spirit and intent" of the will which must control its construction, for the testator's intent is the law of his will, and it is significant that he refers not only to the "spirit" of his will but also of his "Random Notes."
Where the purpose of a bequest in trust is expressed in vague and uncertain language, and "vagueness is to be found in almost every charitable trust" (Woodstown National Bank, c., Co. v.Snelbaker, supra), extrinsic evidence to explain testator's purpose is admissible. Noice v. Schnell, supra; State v.Ready, 78 N.J. Law 599, and authorities therein cited. There is an abundance of such evidence contained in his "Random Notes" and in letters written by him subsequent to the execution of his will.
In correspondence with scientists, educators, c., he spoke of his ideas on philosophy, metaphysics and his "search for truth" (letters to Dr. Millikan, of the California Institute of Technology, 2/23/35 and 3/31/35) — "fundamental knowledge for right living that I felt should be available to all men" (letter to President Hutchins of Chicago University, 1/25/39); also with Professor Bigelow of Yale Divinity School in 1941, Dr. Aydelotte, head of the Institute for Advanced Study, of Princeton, and Professor Greene of the Department of Philosophy of Princeton, in 1943. *Page 120 
And in volume 1 of his "Notes" he wrote as follows:
"Science and religion are not incompatible. Science makes religion more comprehensible. The aim of both is to help make of man better citizens to carry on the world's work which embraces the total activities of millions of separate groups by converging racial groups under different sets of local conditions. Man may wisely use, regulate and control the God-given fire of naturefor the common good but he must not unwisely abuse or misuse them so that more harm than good may result."
And in volume 2 of his "Notes" he wrote:
"Who can man believe; in whose ideas can he put his trust and independence; what ideas are selfishly good for the few; what should be good for the many; what is the true road of thought and action for the good and benefit of all mankind including the few.
"How may basic truth and knowledge be acquired, truly believed, and placed in some practical, rational, workable form for thegood of all mankind."
And in volume 4 of his "Notes" he wrote:
"Philosophy in its search among the possibilities has been too individualistic and has produced a diversity rather than a unity of ideas in its farsight and foresight of knowledge. Because of this lack of a unifying principle, philosophy has not yet been able to naturally help in providing pro and con to the knowledge of sciences." (Italics in the foregoing excerpts from the "Notes" and correspondence are mine.)
These excerpts from the testator's writings clearly indicate that he was interested in research along general philosophical lines, and that it was that sort of research in which he had been engaged and which he desired to have continued and carried forward to a completion, c., as expressed in paragraph "Tenth"
of his will. From these indicia, and from other expressions in his will and "Notes" above-quoted, or referred to, it is not difficult to spell out a general charitable intent on the testator's part as applied to the trust created in paragraph"Tenth."
But we need not rest our conclusion as to the character of this bequest upon either inference or conjecture. The testator himself, in a letter written by him on February 23d 1933, to Isaiah Bowman, president of Johns Hopkins University *Page 121 
and president of the National Research Council, has unmistakably indicated the purpose of the bequest in trust and has, in fact, interpreted and construed this controversial clause of his will for us. In that letter, he said:
"Several years ago by a will which is still valid, I bequeathed a fund of $150,000. under certain conditions to carry forward aresearch work in pure science at which I was then and still am, active." (Italics mine.)
"I provided that the National Academy of Sciences should have the first opportunity to accept or refuse such fund. In the event that they declined, five other institutions were given the same privilege for acceptance."
On March 23d 1935, he wrote Dr. Millikan, referring to a tour of the United States in 1928, and stating, in part, as follows:
"After my return home, I executed a will, which is still valid, in which I bequeathed a fund of $150,000.00 under certain conditions to carry forward a prosearch work in pure science at which I was then and still am active. * * * The California Institute of Technology was included among five other institutions who were given the option to accept or refuse such bequeath. * * * I am interested in the `Search for Truth.' I have striven for truth that may lead to something within the comprehension of the normal man or woman not blessed with a mathy mind."
The will the construction of which is sought in this cause was executed by the testator on January 20th, 1931, four years prior to the dates of those letters. Obviously, it was to this will he referred. It continued "still valid" until his death. Only one fund of $150,000 is "bequeathed" in that will and that for "a research work in pure science," a purpose which is unquestionably educational.
I think it is apparent from the language of this will, and also from his correspondence and "Random Notes," that the testator was eccentric, egotistical, pompous, and had an exaggerated idea of his own importance and the importance or worth of his "Random Notes," as well as of his other possessions. He was, no doubt, touched with megalomania, and he was evidently obsessed with the idea that he was under an obligation and duty to do something magnificent for mankind. He thought he had accomplished something worth *Page 122 
while by his researches and in the writing of his "Random Notes," and he had the urge to go further. There was some question in his mind as to the value of those "Notes," but if they were of any value, he wanted them to be "for the use and benefit of all mankind," and was willing to devote $150,000 of his estate to extend his researches "in pure science," as he characterized them — all "for the use and benefit of all man-kind." That he was mistaken as to the value of the "Notes" does not lessen the value of the pecuniary bequest in trust nor detract from the motives which prompted it. That his researches were valueless and incapable of completion or extension does not alter the fact that he thought they were of "practical value" and that he wanted the trust fund to be devoted to philosophic or scientific researches "for the use and benefit of all man-kind." That this was the real purpose of this trust can not, in my judgment, be gainsaid if we look at his will from its four corners, and consider the other convincing indicia contained in his writings. I, therefore, hold that the trust created by paragraph "Tenth" of the will is a valid charitable trust.
As already indicated, the purposes of this trust can not be literally carried out in the manner designated by the testator, and we must, therefore, now consider the applicability of the cypres doctrine.
The cy pres doctrine is one of approximation; that is, where the testator's original purpose fails, his intent and purpose may be carried out as nearly as may be. MacKenzie v. Trustees,c., supra. By the decision of the Court of Errors and Appeals in that case, it may be said that the cy pres doctrine was firmly established in the jurisprudence of this state. St. JamesChurch v. Wilson, 82 N.J. Eq. 546.
But "the doctrine (approximation), which is applicable solely to charitable trusts, has its limitations. It may be employed only where, upon the failure of the trust, the court finds in the terms of the will, read in the light of the surrounding circumstances, a general intent to devote the property to a charitable use to which the intent that it go to the particular purpose named is secondary." Waterbury Trust Co. v. Porter,131 Conn. 206; 38 Atl. Rep. 2d 598. *Page 123 
"That doctrine (cy pres) is only applicable to technical charitable trusts. The distinction will be found in the opinion of Lord Thurlow in Corbyn v. French, 4 Ves. Jr. 419. It was there pointed out that if it is clearly to be seen that the testator had but one particular object in his mind, and that purpose cannot be answered, the next of kin will take, there being in such case no general charitable intention." Per Bentley, V.C., Raque v. City of Speyer, 97 N.J. Eq. 447. See, also,Brown v. Condit, 70 N.J. Eq. 440.
And "* * * the gift fails where the method prescribed is of the essence of testator's intention and that method has become impractical; or as it is sometimes expressed, testator had no general charitable intention." Rowe v. Davis, 138 N.J. Eq. 122.
In MacKenzie v. Trustees, c., supra, Mr. Justice Green, speaking for the Court of Errors and Appeals (at p. 672), said:
"The doctrine of cy pres is therefore the doctrine of nearness or approximation. * * * in the law of charitable trusts, where gifts have been made for charitable purposes which, either originally or in the course of time, cannot be literally executed. * * * the gift will be administered, as nearly as may be, according to the donor's purpose, under general rules of law.2 Story Eq. Jur. (13th ed.), ¶ 1169; 2 Encycl. Law of Eng.470. * * * In all of these instances it is to be observed that the underlying principle is this: Where the testator or donor had two objects in view — one primary or general, and the other secondary or particular — and these are, literally speaking, incompatible, the particular object must be sacrificed in order that effect may be given to the general object, according to law, and `as near as may be' to the testator's or donor's intention. Again, the principle may be more briefly stated as that of applying property, as nearly as possible, according to the donor's intentions, when those intentions cannot be exactly carried out."
And (at p. 675):
"The sound rule now is — at least in America — that courts will not execute charitable trusts in a manner different from that intended, unless the intent cannot in the original mode *Page 124 
be literally carried out; that they will preserve the substance, although the mode be departed from, and that they will not presume or invent an intention which the testator or donor has not fairly indicated."
"If property is given in trust to be applied to a particular charitable purpose, and it is or becomes impossible or impractical or illegal to carry out the particular purpose, and if the settlor manifested a more general intention to devote the property to charitable purposes, the trust will not fail but the court will direct the application of the property to some charitable purpose which falls within the general charitable intention of the settlor." 2 Restatement, "Trusts" 1208 § 399.
All counsel appearing in this cause, except counsel for Princeton University, contend that the bequest in trust as contained in paragraph "Tenth" is not a charitable trust and that, therefore, there is no occasion for the application of thecy pres doctrine. I have already held that this bequest constitutes a valid charitable trust and, in my judgment, the testator "had two objects in view — one primary or general, and the other secondary or particular" (MacKenzie v. Trustees,c., supra); that the primary or general object of the $150,000 bequest was to "carry forward a research work in pure science" (Bowman letter, supra), or in "philosophy" ("Random Notes,"supra), or in the "Search for Truth" (letters to Professor Millikan), "for the use and benefit of all man-kind" (paragraph"Sixth" of will and "Random Notes," supra); that the "other secondary or particular" object was the editing, printing and distribution of his "Random Notes," and that this secondary or "particular object must be sacrificed in order that effect may be given to the general object" * * * "as near as may be to the testator's or donor's intention." (MacKenzie v. Trustees, c.,supra.) In other words, that this is a case where the application of the cy pres doctrine is peculiarly apt. The complainant is, therefore, instructed and will be directed to pay over to Princeton University the corpus of this trust, or so much thereof as may be available after the payment of prior legacies, bequests or charges against the decedent's estate, in trust "to invest and reinvest the principal *Page 125 
and to use the income in some fitting manner" for scientific and philosophical research in its Department of Philosophy.
Evidence submitted on the final hearing indicates that there will probably be a substantial deficiency of funds in the hands of the complainant executor for the payment of this bequest and that, therefore, there will be nothing left for the payment of pecuniary legacies or bequests in subsequent paragraphs of the will. It is consequently unnecessary for me to consider issues raised herein touching those bequests. However, in view of the possibility that my judgment as hereinabove expressed may not be final, I deem it advisable to dispose of one other controversial matter which has been argued in the briefs of counsel other than counsel for Princeton.
Counsel for one of the next of kin, the defendant John Owens, claims that not only is the trust not charitable and the cypres doctrine not applicable, but that under the terms of paragraph "Twelfth" of the will all subsequent bequests are conditional upon full compliance with the previous provisions of the will, and that, as those provisions, particularly those of paragraph "Tenth," cannot be complied with, the condition upon which the subsequent bequests depend not having occurred, those bequests fail, and the testator died intestate as to that portion of his property disposed of in paragraph "Tenth," and that it should, therefore, be distributed amongst his next of kin. On behalf of the remaining appearing defendants it is contended, however, that the subsequent bequests are not conditional and that as the bequest in paragraph "Tenth" is void then the fund should be applied to the payment of the subsequent bequests.
It should be noted that paragraph "Twelfth" of the will provides for special preference to be given to the bequests in all preceding paragraphs, but the first sentence of paragraph"Twelfth" shows that what the testator had in mind was a deficiency in his estate and that the fear of such a deficiency was the reason for giving precedence to the preceding paragraphs. And paragraph "Thirty-sixth" of the will provides that "if any paragraph of this my will is for any reason held to be illegal or invalid, such decision shall not *Page 126 
affect the validity of the remaining portions of this my will." I think it clearly appears, therefore, that the subsequent bequests were not conditional except upon the availability of funds to pay them, because in that paragraph it is provided that in the event of insufficient funds the bequests shall share pro rata, and that they are made out of "a special or provisional residuum of my estate." That is, if there are sufficient funds in hand, the bequests are to be paid in full; if not, then pro rata, whether that deficiency arose from the invalidity of previous bequests or otherwise. In other words, if there was not enough to go around then the preceding bequests were preferential, but if any of them were void, for example, that contained in paragraph "Tenth,"
then the "provisional residuum" would be increased by the amount of the void bequest. In the event, therefore, that my construction of paragraph "Tenth" is not sustained on appeal, the fund there attempted to be disposed of will be applied to the payment of subsequent pecuniary legacies, so far as it will go, and if there is a deficiency, then pro rata.
I will advise a decree in accordance with these conclusions. *Page 127