**THOMAS E. ROSSER, Trustee *v.* ROBERT C. PREM,**
Special Administrator of the Estate of
Eleanor B. Wasserman

[No. 1364, September Term, 1981.]

*Decided September 3, 1982.*

---

*Note: *Certiorari* denied, Sub Nom. Cohen v. Rosser, Court of Appeals of Maryland November 22 1982.

The cause was argued before MOORE, WEANT and BISHOP, JJ.

*Eugene A. Alexander, III,* for appellant.

*Robert C. Prem,* with whom was *Leonard A. Orman* on the brief, for appellee.

MOORE, J., delivered the opinion of the Court.

> "Put not your trust in money
> but put your money in trust."
> Oliver Wendell Holmes,
> "The *Autocrat of the
> Breakfast Table"* (1858)

The first question in this appeal is whether the trust that Eleanor B. Wasserman sought to create in her will is a valid charitable trust. Because our answer is affirmative, we need not consider the second question — whether the doctrine of *cy pres,* Md. Est. & Trusts Code Ann. § 14-302 (1974), would apply. Our decision requires reversal of the decree of the Circuit Court for Baltimore County (Brizendine, J.) and means that two thirds of Mrs. Wasserman's estate will be used to publish and disseminate her book entitled, "Linda," which concerns her only daughter who died of cancer at the age of eight in 1950.[1]

---

1. The introduction to "Linda" explains why the book was written. We reproduce it in full:

### HOW THE STORY CAME ABOUT AND WHY

For many months after the death of my little girl, in November of 1950, when the miraculous vision and the church records coincided, I told the story to many people. They all wanted to listen.

But, after awhile, like Coleridge's Ancient Mariner, I grew exhausted. I began to leave things out.

I still felt, however, the tremendous impulse to tell it. I was impelled to tell it, for I could not hold it within me. I wanted to help others believe as I had been shown how to believe, particularly parents.

When I was granted, quite suddenly, a voice scholarship at the Music Academy of the West, in Santa Barbara, California, with the great artists John Charles Thomas, and Madame Lotte Lehmann, in the summer of 1951,

## I

Mrs. Wasserman died in December 1978, five years after her husband, Earl B. Wasserman, who had left her all of his estate. Her will, whose validity is not at issue, was dated October 11, 1971, 21 years after her daughter's death. Prepared by attorney Thomas J. Grogan, Jr., it bequeathed one third of her estate to her husband,[2] specific items to relatives,[3] and the rest, residue and remainder to three named trustees[4] who were directed to:

> *"[A]pply the net income therefrom and whatever portion of the corpus of this trust estate which may*

I rode out on the Atchison, Topeka and Sante Fe and returned by the Northwest Passage on the Milwaukee Road, the train company kindly rerouting my ticket.

In Seattle, Washington, I had a sister, Celeste, whose husband is Dr. Morton E. Bassan. He arranged that I tell the story into a dictaphone and he had his secretary type it. He tested me for extra-sensory perception, at the same time. He is interested in ESP, as many people are today. Nothing significant was found.

Thus the twenty-two pages, the nucleus of a book, suddenly were there in my hands.

From this, all the writing has stemmed and has grown into three separate books, the first one completed being "LINDA".

Eleanor B. Wasserman

The "miraculous vision" to which Mrs. Wasserman refers is explained by James S. Cox, then Dean of St. Andrew's Church in Honolulu, Hawaii, in the Preface to "Linda." We quote from it:

Some may have some difficulty in accepting the author's interpretation of the events after her daughter's death. I do myself, although I was to some extent involved in them. I still remember my astonishment when she produced the crayon sketch of the Church seen in her dream. It was the pre-restoration Church of which I was then Rector and which she could never have seen. Whatever the valuation placed on this incident, it was the turning point in her life, but it does not in any way affect the validity of the Christian position she reached through her Judeo-Christian background.

**2.** Since Mr. Wasserman predeceased his wife, the share left to him should pass to those named in his will, in this case, his wife. Md. Est. & Trusts Code Ann. § 4-403 (1974). Since she, too, is deceased, the one-third share passes by statute to those sharing in her residuary estate. The master's disposition of this share of Mrs. Wasserman's estate was not excepted to by either party.

**3.** Mrs. Wasserman left a diamond ring to her niece, Elizabeth Ann Bassan, a wrist watch to another niece, Joann Dahan, a diamond pendant to her grandniece, Odetta Jane Dahan, and her silverware to her nephews, David, Jonathan, and Morton Bassan, share and share alike, all appellees here. Dorothy Cohen, Mrs. Wasserman's sister, is also an appellee.

**4.** The trustees were Cecil C. Grasty, who renounced both as trustee and executor, the Reverend George T. Aulton, who was never located, and Thomas E. Rosser, appellant here.

*be required to preserve and protect the manuscript
and illustrations and copyrights of my book entitled
'Linda', and in their discretion insofar as said
Trustees find this procedure practicable to have
said book widely published in expanded and revised
form, if this should be helpful, in as many editions
as may be deemed necessary and to have the mate-
rial used in whatever form and by whatever method
it appears to them to be most feasible.*

"It is my wish and desire that the entire corpus of
this trust estate, together with any accumulated
income therefrom be used by my said Trustees to
carry out the above trust with respect to my said
book entitled 'Linda' and the second edition thereof,
which I am about to publish.

"If I shall die before I publish the second edition,
I authorize my Executors to employ some Christian
Writers to complete the work." (Emphasis added.)

Following his appointment as personal representative,
Mr. Grogan, now deceased, sought a declaratory judgment,
pursuant to Md. Cts. & Jud. Proc. Code Ann. §§ 3-406 and
3-408 (1980 Repl. Vol.) and Md. Est. & Trusts Code Ann.
§ 14-301 (a) (1974), requesting the court to instruct him as
to whether the will created a valid trust. Thomas E. Rosser,
trustee and appellant here, filed an answer, averring that
the trust was valid. At a hearing before a master on August
11, 1980, "Linda," a bound, copyrighted, and illustrated vol-
ume of 102 pages, was admitted into evidence, along with
letters from two experts, Carol Abromaitis, an associate
professor of English at Loyola College, Baltimore, and
Eleanor Merryman Roszel, an author's representative. The
former testified that the book "Linda" was "without
aesthetic merit," being structurally flawed by "a
mishandling of point of view" and stylistically flawed by
"grammatical errors." Ms. Roszel passed on the book's
"publishability," concluding that "Linda" had "no
ready-made audience and therefore no marketability." Mr.
Grogan, the author of the will, testified that had he seen a

copy of the book before drawing up the will, he would have tried to discourage Mrs. Wasserman. His assessment of "Linda" was: "ungodly bad." [5]

The master concluded that Mrs. Wasserman's will did not create a valid trust, stating in his memorandum opinion: "The book 'Linda' sets forth no doctrine. It advocates nothing. It promotes no matter of special interest to the community. It certainly is not a literary gem."

Appellant excepted, but before the circuit court hearing, Mr. Grogan died. He was replaced by Robert C. Prem, appellee here. On October 8, 1981, the circuit court determined that the trust was invalid on two grounds: first, as a private trust, it lacked ascertainable beneficiaries;[6] second,

---

**5.** Mr. Grogan was emphatic in his dislike of "Linda." He told the master at the August 11, 1980, hearing:

"THE WITNESS: It was unreadable; things a little baby said. Some of them had the wish and wisdom of a grandmother, the things she'd put into the child's mouth. It was very uninteresting.

MASTER PITTS: You are referring to the original book.

THE WITNESS: I'm referring to the initial book, yes sir.

BY MR. ALEXANDER (plaintiff's counsel):

Q. Are you a literary critic, Mr. Grogan?

A. No, sir.

Q. Why do you classify it as ungodly bad?

A. Because an average citizen who would buy the book wouldn't read it.

Q. How would you know that?

A. The girls in the office all tried to read it.

Q. And they are the average citizen, is that it?

A. Yes, sir.

Q. That is the basis of your determination that it is ungodly bad, the girls in your office?

A. No. My own trying to read it.

Q. Your own. You and the girls in your office?

A. Yes.

Q. And that makes it ungodly bad?

A. In my eye, yes.

MR. PREM (appellee here): I wish to state at this point that the girls in the office are above average."

**6.** Appellant in his brief disavows any contention that a private trust was intended by Mrs. Wasserman. Thus, the case cited by the master, *Waesche v. Rizzuto,* 224 Md. 573, 168 A.2d 871 (1961), is not applicable because it concerned a private trust which requires an element not necessary to cre-

as a charitable trust, it lacked the necessary elements.[7] As a result, the net residuary estate was ordered distributed to the heirs at law. This appeal followed.

## II

Charitable trusts in Maryland have attracted little appellate attention in recent years although the legacy of cases prior to the adoption of § 14-301 *et seq.* in 1974 is ample.[8] In 1888, the legislature enacted a statute that no bequest for charitable uses would be void for uncertainty of

---

ation of a charitable trust, that is, a designated person for whose benefit the trust property is held. *Id.* at 583, 168 A.2d at 875.

7. The chancellor did not say what elements were missing but agreed with the findings of the master. He said from the bench:

> "And I agree that looking at the whole picture, that to find the elements necessary to make this a charitable trust would be lacking. This Court can't find the necessary requisites to spell out a charitable trust. I don't think the intent was that anything of this nature could be considered to be a charity. Doesn't appear to the Court that way, . . ."

8. Cases decided since the charitable trusts subtitle of Md. Est. & Trusts Code Ann. § 14-301 *et seq.* (1974) took effect in 1974 include: *Loyola Fed. Sav. & Loan Ass'n v. Galanes,* 33 Md. App. 559, 365 A.2d 580 (1976), *cert. denied,* 279 Md. 683 (1977), which merely cited the statute; and *Carroll Park Manor Community Ass'n v. Board of County Comm'rs,* 50 Md. App. 319, 437 A.2d 689 (1981), which held that the question was not whether taxpayers had standing to enforce a charitable trust but whether they could invoke the aid of an equity court to restrain public officials from *ultra vires* acts.

The editor's note to the Estates and Trusts article stated that certain cases decided under the former statute have been retained in the annotation because they have some value in interpreting the present statutes. Although now outdated, several early cases are worth noting:

*Isaac v. Emory,* 64 Md. 333, 1 A. 713 (1885), cited by the master in his memorandum opinion, involved a deed of land to be used as a place of worship by the Methodist Episcopal Church. The gift failed because of indefinite beneficiaries and the appeal was dismissed. The case stated the familiar premise, now discounted in the case of charitable trusts: "According to the uniform course of decisions in this State, a trust cannot be upheld unless it be of such a nature that the *cestuis que trust* (beneficiaries) are defined, and capable of enforcing its execution by proceedings in a Court of Chancery." *Id.* at 337.

*Bennett v. Baltimore Humane Impartial Society,* 91 Md. 10, 45 A. 888 (1900), involved a bequest to a home for aged men and women. The court held that no trust was created because of the uncertainty of the beneficiaries and creation of a perpetuity but that the gift was valid, subject to the condition subsequent. The next of kin had claimed that the will created a trust and it was void; therefore, they inherited. The court

beneficiaries, provided a corporation existed to take the same. See Md. Ann. Code Art. 93, § 357 (1957). The statute was amended in 1908 to remove the bar of perpetuities from charitable trusts, but not until 1931 were the principles of the statute of 43 Elizabeth Ch. 4 (1601) formally adopted in this State. Code, *supra,* Art. 16, § 268A (1935 Supp.). *See* Howard, C., *"Charitable Trusts in Maryland,"* 1 Md.L.Rev. 105 (1937).

As the Court of Appeals noted in *Second National Bank v. Second National Bank,* 171 Md. 547, 556-7, 190 A. 215, 219 (1937), this statute, which is the predecessor of § 14-301, did not mark the beginning of charitable trusts in Maryland, for courts of equity had exercised jurisdiction over charitable trusts from antiquity. Many, of course, had failed for uncertainty or perpetuities, *see* cases collected in *Howard, supra,* n.36 at 117. These trusts would be valid and enforceable under Art. 16, § 268A. The court pointed out that courts in states with the statute have upheld as charities many objects of benevolence which the statute neither mentions nor implies. Similarly in this State, a trust to establish a

---

remarked: "Courts are not, or ought not to be, astute in searching for a construction which nullifies a will if there are other equally reasonable interpretations which uphold it." *Id.* at 18, 45 A. at 889. *See* Emmert v. Union Trust Co., 86 N.E.2d 450, 455 (Ind. 1949) (Gilkison, dissenting) *("ut res magis valeat quam pereat"* — that the thing may rather have effect than be destroyed).

*Rabinowitz v. Wollman,* 174 Md. 6, 197 A. 566 (1938), involved a residuary gift to "such religious, charitable, scientific, literary or educational Hebrew corporations or associations" as might be selected by the executors. The Court applied the statute removing indefinite beneficiaries as an objection to the validity of a gift and held that the trustees had the power to choose appropriate institutions in effectuating the intent of the testatrix.

*Salem Church of the United Brethren v. Numsen,* 191 Md. 43, 59 A.2d 757 (1948), involved a deed of land to an unincorporated religious association. The trust failed because designation of the beneficiaries was too vague and indefinite, a failing since cured by § 14-301 (c). The holding in the case was that the religious society did not acquire title by adverse possession.

*Second National Bank v. Second National Bank,* 171 Md. 547, 190 A. 215 (1937), involved the construction of Md. Ann. Code Art. 93, § 337, the predecessor of § 14-301 (c), which then provided, in addition, that a corporation had to be formed to take the gift. The court held that a gift for an indefinite class, in this case "unfortunate girls," will be upheld if the object is for a purpose commonly understood as charitable. *Id.* at 558, 190 A. at 221.

home for "unfortunate girls" was held to be charitable, *Second National, supra,* and more recently, *Register of Wills v. Cook,* 241 Md. 264, 216 A.2d 542 (1966), held that a trust to help further the passage of the Equal Rights Amendment and assist women suffering from the effects of sexual discrimination in the laws of Maryland and the United States was essentially charitable in nature, "[w]hatever may be the views of individuals, laymen or judges. . . ." *Id.* at 278. Because we have found no Maryland case concerning a charitable trust to publish a book, we begin our analysis on common ground with the appellant and appellee concerning the definition:

> "A charitable trust is a fiduciary relationship with respect to property arising as a result of a manifestation of an intention to create it, and subjecting the person by whom the property is held to equitable duties to deal with the property for a charitable purpose."

*Restatement (Second) of Trusts* § 348 at 210 (1959). Both sides also agree that § 368 of the *Restatement* sets forth the permitted charitable purposes:

> (a) the relief of poverty;
> (b) the advancement of education;
> (c) the advancement of religion;
> (d) the promotion of health;
> (e) governmental or municipal purposes;
> (f) other purposes the accomplishment of which is beneficial to the community.

*Restatement, supra,* § 368 at 246. These purposes, derived from the Statute of Elizabeth, *supra,* were broadened in § 14-301 (b) to include "purposes within either the spirit or letter" of the venerable statute.[9] It is likewise undisputed

---

9. Charitable purposes beyond the confines of the first five categories mentioned in the *Restatement (Second) of Trusts* § 368 at 246 (1959), are explained in the comments to § 374 at 257. Comment 1 discusses "unpopular causes," for which the publication of "Linda" qualifies, in the

that a charitable trust can be created without a definite or definitely ascertainable beneficiary designated, *Restatement, supra,* § 364 at 243, and is not invalid although continuing for an indefinite or unlimited period, *id.,* § 365 at 244; § 14-301 (c).

Appellant argues that the trust created by Mrs. Wasserman qualifies as a charitable trust on two grounds: first, it would advance education through "the dissemination of knowledge or of beliefs by the publication of books and pamphlets . . .," *Restatement, supra, comment a* to § 370 at 251; second, it would advance religion by disseminating "religious beliefs or doctrines; . . ." *id., comment a* to § 371 at 254.

Appellee states that "publication of the book 'Linda' falls short of a charitable purpose" because it is of little or no value to the community in advancing either education or religion. The test, according to appellee, is stated by Professor Bogert: "[I]f the court comes to the conclusion that

---

view of the late Mr. Grogan, appellees, the chancellor, and the master. We quote from comment 1:

"1. *Unpopular causes.* If the general purposes for which a trust is created are such as may be reasonably thought to promote the social interest of the community, the mere fact that a majority of the people and the members of the court believe that the particular purpose of the settlor is unwise or not adapted to the accomplishment of the general purposes, does not prevent the trust from being charitable. Thus, a trust to promote a religious doctrine is charitable although the doctrine has few adherents. So also, a trust to publish books or pamphlets or to give lectures advocating the doctrine of the single tax is charitable, even though the doctrine may have few adherents. *One of the great advantages resulting from charitable trusts is in the fact that they permit experimental tests of ideas which have not been generally accepted.*

The courts do not take sides or attempt to decide which of two conflicting views of promoting the social interest of the community is the better adapted to the purpose, even though the views are opposed to each other. Thus, a trust to promote peace by disarmament, as well as a trust to promote peace by preparedness for war, is charitable." (Emphasis added.)

*Id.* at 261.

The experimental idea alluded to by Mrs. Wasserman in "Linda" is extra-sensory perception, in which she had an interest, and of which, according to the book, she had several personal experiences.

it would be irrational to regard the trust as bringing about any public benefits, but rather that the trust would be useless to society, the court will hold the trust noncharitable. . . ." Bogert, *Trusts and Trustees* § 368 at 58 (2d ed. rev. 1977). Appellee relies on the *Restatement's* no-nonsense *comment m* to § 374 that "a trust to publish and distribute the writings of the testator is not enforceable if his writings are of no value." *Restatement, supra,* at 262.

Professor Scott echoes this flat prohibition: "A trust to publish worthless writings is not valid, either as a charitable trust or as a private trust." II *Scott on Trusts* § 124 at 963-4 (3d. ed. 1967), *citing, Fidelity Title & Trust Co. v. Clyde,* 121 A.2d 625 (Conn. 1956). Professor Bogert, whom appellee quotes extensively, is somewhat scathing in his view of "educational trusts [that] seek to propagate eccentric ideas," producing no substantial advantages to society, Bogert, *supra,* § 375 at 134, and whimsical or irrational trusts, made out of mere sentiment, that have no practical effect except to satisfy the whim of the testator and waste the assets of the estate. *Id.,* § 379 at 204.[10]

---

10. What is thought irrational varies with time and place. *See* State Tax Commission v. Whitehall Foundation, Inc., 214 Md. 316, 322, 135 A.2d 298, 301 (1957) ("conceptions of public charity, benevolence, and education change with the passing generations"; gift to promote horticultural or agricultural improvements is charitable); Eckles v. Lounsberry, 111 N.W.2d 638 (Iowa 1961) (bequest to promote instruction in vocal music and the proper development of the lungs of young children held charitable). The determination of rationality is sometimes difficult, as in the case of an idea born before its time. What court in 1400 would have enforced a trust to publish the writings of one who believed the world was round? What court today would not uphold a trust to publish the writings of those who believe the earth is flat?

Among the whimsical or irrational trusts noted by Professor Bogert is a gift to provide a band to march to the testator's grave on his birthday and play dirges. Bogert, *Trusts and Trustees* § 379 at 204 (2d ed.rev.1977). Professor Scott points out that "it is not always easy to draw the line between purposes believed to be irrational and those believed to be merely unwise. The test is not what the court believes, and not what the majority believe, but what rational persons may believe." *IV Scott On Trusts* § 374.7 at 2920-1 (3d. ed. 1967).

In *National City Bank v. Case Western Reserve University,* 369 N.E.2d 814 (Ct.C.P. Ohio 1976), the testatrix ordered her beautiful home razed. Witnesses testified that she felt it had no future as a residence because of its expensive upkeep, and that she would rather have the home destroyed than see it used commercially as had so many of the once-fine residential tracts surrounding her property. The court decided that while her purpose

Appellee's position seeks to put this Court in the unaccustomed role of literary critic, but before we review the lower court's decision that the book "Linda" "wasn't much good" and therefore failed as a charitable trust,[11] we will consider whether the other required elements of a charitable trust, as set forth in the comments to § 348 of the *Restatement* at 210-11, are present. These elements are:

### a. fiduciary relationship

was impelled by sentiment, her real desire that her home endure as a residence was not capricious or irrational, and that desire could be effectuated by selling the property to an historical society that would maintain it for the use of the public. *Id.* at 818-9.

Two other recent cases involving the razing of property were decided on a different ground. *In re Will of Pace,* 400 N.Y.S.2d 488 (Sur.Ct. 1977) held that a testatrix's direction to level her property was clearly destructive, produced no benefit to offset the waste of the asset, was purely capricious in that the testatrix's wish was not something she would have done while alive, and would not be upheld because the result would be absurd and abhorrent to public policy. *Id.* at 493.

The razing of a home in *Eyerman v. Mercantile Trust Co.,* 524 S.W.2d 210 (Mo.Ct.App. 1975) was also held to violate public policy in that it was "senseless destruction serving no apparent good purpose...." *Id.* at 217. The case cited the *Restatement's* examples of capricious purposes — the testator who directed that his money be thrown into the sea and the testatrix who ordered her home boarded up for 20 years. *Id.* at 216. The dissent stated acidly that the majority had allowed "wispy public policy" and "aesthetic sympathies" to interfere with legal judgment. *Id.* at 218. *In re Estate of Coleman,* 317 A.2d 631 (Pa. 1974) held that the testator's direction that all trustee successors be Protestant was a personal vagary and unrelated to the proper trust purpose. "[J]udicial significance need not attach to all manifestations of a settlor's whimsy ... and not every notion of a settlor is entitled to judicial vindication." *Id.* at 634.

11. The dialogue between Eugene A. Alexander, III, representing appellant here, and the chancellor went as follows:

"MR. ALEXANDER: Your Honor, if Your Honor please, this case involves a trust that was created in the last will and testament of an individual named Eleanor B. Wasserman. She had an unfortunate tragedy in her life. She had a daughter whom apparently she loved and was devoted to, who died at a very young age. And she wrote this book called "Linda."

THE COURT: Apparently wasn't much good, was it?

MR. ALEXANDER: Sir?

THE COURT: Wasn't much good, was it?

MR. ALEXANDER: What?

THE COURT: The book.

MR. ALEXANDER: Well, I don't think that makes any difference for the purposes of this case, as far as that's concerned. I am just telling you why she did it, sir."

b. duties of trustees

c. trust property

d. manifestation of intention

e. charitable purpose

The first three elements give us little pause. The fiduciary relationship in a charitable trust is between the trustee and unknown beneficiaries who will come forward upon operation of the trust. The trustee of a charitable trust is subject to equitable duties as defined in §§ 169-185 of the *Restatement.* In this case, these duties might include hiring an editor, publisher, and distributor for Mrs. Wasserman's book. The trust property — two thirds of the estate — is obviously a proper subject of the trust, as is the object of the trust — the book.

The fourth element requires some analysis. Mrs. Wasserman's intention to create a trust is evident in the will. *See Waesche v. Rizzuto,* 224 Md. 573, 583, 168 A.2d 871, 875 (1961). Whether she meant to create a charitable trust is not immediately apparent from the language of the will itself, which mentions neither the word "charity" nor any of its synonyms or variations. However, that omission is not dispositive. *See Second National Bank, supra,* 171 Md. 550-1, 190 A. at 216-7; *cf. Woman's Foreign Missionary Society v. Mitchell,* 93 Md. 199, 48 A. 737 (1901) (bequest to educate six girls in India as Bible readers held valid gift with a condition, despite words "in trust" used in will). Section 358 of the *Restatement* tells us that the intention to create a charitable trust may be ascertained:

(a) from the will itself; or

(b) from an existing instrument properly incorporated in the will by reference; or

(c) from facts which have significance apart from their effect upon the disposition of the property devised or bequeathed by the will.

*Restatement, supra,* § 358 at 223-4.

The published book "Linda," the object of the trust, con-

tains an introduction, see n.1, supra, that manifests Mrs. Wasserman's intention "to help others believe as I had been shown how to believe, particularly parents." The preface, written by James S. Cox, then Dean of St. Andrew's Cathedral in Honolulu, Hawaii, expands upon this intent and alludes to the intended beneficiaries:

> "When the author first came to me some time after the death of her daughter, I knew her to be struggling with a grief too great to bear without some effort on her part to justify the bitter pain of bereavement — to find some working answer to the enigma of human existence. Her quest led her over a curious path but through the same valley of decision and faith countless others have encountered and will encounter. It is to help the latter that she was led to write her book."

Manifestation of Mrs. Wasserman's intent is thus externally expressed — she wanted to publish and disseminate the book "Linda" and two others, then and still not completed, to offer solace and spiritual guidance to parents plunged into the unimaginable mental anguish produced by the loss of a young child.[12]

Appellees do not contend that any of the first four elements are lacking: they simply assert that there is no charitable purpose [13] because "Linda" has no literary value

---

**12.** Books that have dealt with this theme include John Gunther's "Death Be Not Proud, a Memoir," which describes the death of his son, (Harper, 1949; 2d ed., Modern Lib. 1953), and a recent best seller, "Why Do Bad Things Happen to Good People?" (Schocken, 1981) written by a rabbi, Harold S. Kushner, whose son died of a premature aging disease.

**13.** The word "charity" has always been afforded a broad meaning in law. It includes "substantially any scheme or effort to better the condition of society or any considerable part thereof." Wilson v. First National Bank, 145 N.W. 948, 952 (1914). "It may be for any purpose in which the public has an interest such as . . . the spread of the truth . . . ." Collins v. Lyon, 24 S.E.2d 572, 580 (1943). Charity "embraces the improvement and promotion of the happiness of man." People ex rel. Scott v. George F. Harding Museum, 374 N.E.2d 756, 761 (App.Ct.Ill. 1978). Such an expansive definition of charity logically leads to the "universal doctrine that charitable trusts should be liberally construed . . . so as to give them effect if possible. . . ." Baily v. McElroy, 195 N.E.2d 559, 566 (Ct.App. Ohio, 1963).

and its dissemination will produce no public benefit. Therefore, they contend, the trust is invalid and unenforceable. The testimony before the master amply demonstrates the book's shortcomings, appellees point out, citing authority dealing with other writings deemed "worthless."

Thus, in *Wilber v. Asbury Park National Bank & Trust Co.*, 59 A.2d 570 (1948), *aff'd sub nom, Wilber v. Owens*, 65 A.2d 843 (N.J. 1949), the testator directed that $15,000 be spent to type, edit, and distribute his manuscript entitled, "Random Scientific Notes Seeking the Essentials in Place and Space." The lower court refused to do so, finding the writings "irrational, unintelligible, and of no scientific or other value," and their publication "a waste of money." *Id.* at 578. The court did apply the *cy pres* doctrine, however, because the will showed general charitable intent, and the judgment was affirmed.

We distinguish the *Wilber* case on three grounds. First, the will had no friends — all counsel agreed that the express purpose of the will was "impossible of performance." *Id.* at 579. That is not so in this case. Second, the testator, according to the trial judge, was "eccentric, egotistical, pompous, and had an exaggerated idea of his own importance"; he was "touched with megalomania," and "evidently obsessed with the idea that he was under an obligation and duty to do something magnificent for mankind." *Id.* at 584. We have no such testator here. Third, several of the institutions named as beneficiaries refused to accept the gift on the testator's terms that his "Notes" be published. That is not the instant case.

In affirming the trial court's application of the *cy pres* doctrine, the Supreme Court of New Jersey dealt more gently with the quality of the testator's work, and its observations are apposite:

> "He sought to add 'a small bit to the sum-total of desirable human knowledge, for the use and benefit of mankind.' This we find in the 'Introduction' to the first volume of his Notes. True, his Notes contributed nothing to the sum of human knowl-

edge; and their development would not add to wisdom. Indeed, they have been termed 'irrational and incoherent.' Dr. Scoon said a part was understandable and a part not. Yet to the testator the test was real and vital and entirely reasonable in keeping with his own meager understanding of the subject. . . . He conceived that his reflections and conclusions would provide the basis and the impetus for philosophic research that would in the end be socially constructive and otherwise serve the common good; but the *charitable intent does not depend upon the scientific validity of his views or the depth of his understanding. We are not concerned with his philosophic or sociologic orthodoxy or rationality.* Whatever the utility of his contribution, his undoubted aim was the use of his Notes as the beginning of an understanding that would in scientific hands redound to the advantage of mankind. That was his avowed purpose." 65 A.2d at 846. (Emphasis added.)

In support of his view that the book "Linda" is worthless, appellee refers us to a case cited by Professor Scott, IV *Law of Trusts, supra,* n.5 at 2872. *Fidelity Title & Trust Co. v. Clyde,* 121 A.2d 625 (Conn. 1956) held that a trust to publish a deceased attorney's writings was invalid as contrary to public policy. *Id.* at 629. A sampling of the titles of the pamphlets proposed to be published supports the court's reaction of repugnance to this so-called "educational trust for charitable purposes.[14] *Id.* While the case is completely distinguishable, we agree with the court's statement that

---

**14.** The attorney-author retired from practice in New York State in 1904. Thereafter, he devoted himself to writing and published a bibliography in 1934. Some of the titles were *"Ertogenesis of Religion," "Divinity in Semen," "Why Priests Don't Marry,"* and *"Phallic Worship to Secularized Sex."* Later titles focused on the same and related subjects — *"The Love-Hate Complex," "Three Attitudes Toward Sex," "Sadism in Mormonism,"* and *"Sanctified Lust."* Associate Justice O'Sullivan declared that a trust to "distribute articles which reek of the sewer" will not be held valid, remarking that his reading of one of the articles was "a truly nauseating experience in the field of pornography." Fidelity Title & Trust Co. v. Clyde, 121 A.2d 625, 629 (Conn. 1956). Such a holding would be

> "where the purpose for which the trust was created
> constitutes a valid charitable use, the educational
> value of the books or pamphlets to be distributed is
> ordinarily of no concern to the court, nor is the liter-
> ary merit of the material a proper subject of judicial
> inquiry."

*Id.*

Appellee also refers us to 12 ALR2d, Annot. Charitable
Trust — Validity § 2 at 861 (1950), but the cases found there
tend to support the theory expressed in § 2, which is at
variance with appellee's position:

> "Broadly speaking, the publication of writings is
> regarded as a furtherance of education and,
> therefore, a valid charitable object. Excluding
> advocacy of immorality or crime, no inquiry is made
> into the rightness or wrongness of the views
> expressed . . . [I]t is required that the writer be
> rational. The writings may espouse an unpopular
> doctrine; . . . In modern times, the author may take
> any view he pleases respecting the forms of
> religion."

The case of *In re Hamilton-Grey,* 38 New So.W.St. 262
(1938), discussed in the annotation at 862, is instructive. The
testatrix left all her property in trust to disseminate her
three published books on the life and poetry of Henry
Kendall, the "Australian Wordsworth." Expert and lay wit-
nesses testified that her books were worthless as literary
criticism and had little biographical value. Nonetheless, the
court refused to hold publication and distribution of the
books noncharitable. "Judicial inspection of the books was
confined to a search for contravention of law and morals,
and, they being cleared on this score, their object of

---

questioned today, in view of changing public mores. *See* n.10, *supra.* In fact,
as Professor Scott noted, the "purposes for which trusts can be created are
as unlimited as the imagination of lawyers." Scott I, *Law of Trusts* § 1 at 4
(3d. ed. 1977).

awakening interest in the poet was educational." Annotation, *supra,* at 863.

The one case supportive of appellee's position, *State ex rel. Emmert v. Union Trust Co.,* 86 N.E.2d 450 (Ind. 1949), is disparaged by the author of the annotation as an unfortunate result that "flows upstream in the current of authority." Annotation, *supra,* at 864.

The court held that a will directing the executors to publish and distribute the diaries of the testator's grandfather, admittedly of educational value, was not a valid charitable trust because the will evidenced no charitable intent or purpose. Chief Justice Gilkison's stinging dissent noted that: "A gift to the use of the general public is always construed to be a public charitable trust." *Emmert, supra,* 86 N.E.2d at 455.

The one caveat espoused by both Scott and Bogert is that a charitable trust must provide some societal benefit. Bogert, *supra,* § 361 at 3; Scott, *supra,* § 374.7 at 2920; *see Restatement, supra, comment m* to § 374 at 261.

> "The question is not whether the trust is in harmony with the prevailing public views as to what purposes are of advantage to society. The court sanctions the advancement of many minority causes, for example, aid to religious sects which have few followers and trusts to promote governmental changes which are not popular.
>
> *The court should not hold the trust to be noncharitable merely because it does not approve of the objectives of the settlor and does not consider that his trust will bring about social benefits. If, notwithstanding its disapproval, the court finds that the settlor and rational men in general might reasonably believe that public advantages would accrue, it may hold the trust to be charitable, for example, in the case of a trust to promote vegetarianism."* Bogert, *supra,* § 368 at 56-7. (Emphasis added.) (Footnotes omitted.)

An excellent example of a "minority cause" is found in *In re Estate of Kidd,* 467 P.2d 770 (Ariz.App. 1970), which involved a holographic will that left the balance of the estate to fund "research or some scientific proof of a soul of the human body which leaves at death. I think in time their [*sic*] can be a Photograph of soul leaving the human at death." *Id.* at 771. The case attracted much publicity for the seemingly impecunious gentleman had left $174,000 in stocks and bonds. The court did not hesitate to find a charitable trust. *Id.* at 774. *See also* the early case of *Thornton v. Howe,* 31 Beaver 14, 54 Eng. Reprint 1042 (1862), discussed in annotation, *supra,* at 869.

A charitable purpose may be found in "almost anything that tends to promote the well-doing and well-being of social man," *Ould v. Washington Hospital for Foundlings,* 95 U.S. 303, 311 (1887). Well-being consists not only of physical health and surroundings but also of mental happiness. While the book "Linda" received a failing grade from the English professor and a rejection notice from the publishing agent, we need not review it as might a critic for *The New York Times* Book Review. Mrs. Wasserman's book details her search for mental solace and spiritual peace in a rational, if not editorially elegant, manner.

At oral argument, appellant stated that the book "Linda" was not silly or frivolous. From our reading, we cannot disagree. The appropriate test is not whether the book is marketable — the trust provides for its distribution, so it need not be sold but may be given away. Nor does the trust's validity depend on the book's literary style and grammatical accuracy. The trust provides for expansion and revision "as may be deemed necessary." Mrs. Wasserman made no pretense of being a professional author.[15]

---

**15.** Despite some grammatical errors, the lack of chapter or paragraph headings and the need for professional editing, the book "Linda" is not at all irrational. We quote two passages which are especially striking. In the first, Linda is speaking to her mother:

"Well, Mommy, I know this much. It's not right for one person to say another is not as good ,as he is because he isn't the same color or the same religion. God wants everyone to be alike. We are all human beings. There

Parents facing the mental, emotional and spiritual crises that follow the death of a child may benefit from a reading of "Linda," or a professionally edited and revised version of it, for which the will provides. As the Rev. Mr. Cox stated in the Preface:

> "Some will find their chief interest of the book in the thorough knowledge of Old Testament religion revealed by the author, and how she found its fulfillment, and hers, in the Christian Church. Others will be moved by the personal experience of the author and, perhaps, find hope in their own situation. At least they will feel that a deep experience shared by them has been put into simple and expressive words, and be glad."

The named trustee, appellant here, stood ready to carry out his equitable duties — to have the book "widely published in expanded and revised form," insofar as this procedure was practicable. The trust confers broad discretion upon the trustee to employ "Christian Writers" to complete the second edition and "to have the material used in whatever form and by whatever method . . . appears . . . to be most feasible." *Cf. Rabinowitz v. Wollman,* 174 Md. 6, 7, 197 A. 566, 567 (1938) (trustee given discretion to choose charitable Hebrew institutions to receive bequest).

Mrs. Wasserman's intent is clear — to help bereaved parents by providing her "answer to the enigma of human

---

is only one God and we are the same to Him. Colored people are good and so are the people who have a different religion. Those are my own ideas!"

In the second, Linda is talking about her mother's quest for spiritual solace:

"Being with children a lot helps her to see how God wants us to think. We have to think in symbols, too. Everything around us is a symbol. The things we see all mean something much more real than our eyes tell us.

"God is everywhere. He is in the trees, in the oak trees, symbols of power and strength and eternity. He is in the birds, symbols of the soul. He is in the squirrels, scratching away for the fruits and acorns. They are symbols of forethought, knowing ahead the things for God. They are symbols of spiritual striving always being busy to go higher to God. They are symbols, when they sit and watch and wait, of meditation of God's Divine Word, and all His things of earth, part of Him."

existence," through the story of her daughter and her own spiritual passage from Judaism to Christianity. This Court will not thwart her intent.

In light of the principles of law, as expressed in our statute, the decided cases, the *Restatement,* and the treatises,' we find that the trust created by Mrs. Wasserman's will is charitable and capable of being carried out by the trustee.

> *Judgment reversed; case remanded for the issuance of a declaratory judgment conformably with this opinion; appellee to pay the costs.*